The **BILTMORE COMPANY**, a corporation, Trading and Doing business under the name and style of Biltmore Dairy Farms, Plaintiff,

v.

The **UNITED STATES** of America.

Civ. A. No. 1306.

United States District Court,
W. D. North Carolina,
Asheville Division.

March 8, 1955.

Junius G. Adams, Joel B. Adams, Asheville, N. C., for plaintiff.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, John K. Clifford, Sp. Assts. to the Atty. Gen., J. M. Baley, Jr., U. S. Atty., Asheville, N. C., for defendant.

WARLICK, District Judge.

This action is brought against the defendant to recover of it alleged overpayments of income taxes, together with interest, for the years 1943 through 1946, in the aggregate amount of $9,543.74.

The principal issue relates to the correct treatment for tax purposes of the net gains on the sale of dairy cattle held by the plaintiff for six months or more and sold by it during the tax years. The plaintiff contending that the receipts should be determined as long-term capital gains for each year. The defendant insisting that these profits for which an income tax would be due should be taxed as ordinary income. The case arises and is to be determined under Secs. 117(j) (1, 2) of the Internal Revenue Code of 1939 and Sec. 324 of the Revenue Act of 1951, 26 U.S.C.A. § 117(j) (1, 2), generally known as the capital gains statutes of property used in the trade or business.

The cause was presented on the admissions in the pleadings, stipulations entered into, and the oral testimony of two

witnesses. From the evidence heard the following findings are made:

### Findings of Fact.

1. The plaintiff, a Delaware corporation, has its principal business activities in and near Asheville, North Carolina, and is primarily engaged in producing, processing, and distributing milk, cream, ice cream, cheese and other dairy products under the trade name of Biltmore Dairy Farms. In addition the plaintiff occassionally sells some of its purebred Jersey cattle.

2. The principal processing plant and the principal office of the plaintiff's dairy business are located on the Biltmore Estate near Asheville in Buncombe County, North Carolina, and the plaintiff owns and maintains on the Biltmore Estate a herd of from 1,100 to 1,500 purebred dairy cattle. The entire milk produce of this herd is processed by the plaintiff at its Biltmore plant and sold by the plaintiff to its customers in its dairy business. The plaintiff deals in no other type of cattle.

3. Throughout the years 1943, 1944, 1945 and 1946 the plaintiff's herd was owned and maintained in the same manner and for the same purposes as it now is, except that during such years it contained a number of grade, or unregistered, dairy animals that had previously been purchased by the plaintiff as a result of its policy of discontinuing the use of tenant farmers in the production of its milk. During said years such grade cattle were being culled and eliminated from the plaintiff's herd, and the plaintiff was in the process of building up its herd both as to size and quality of breeding to provide raw milk to be processed and sold by it.

4. On December 31st in each of the tax years involved the plaintiff's herd was made up of the following animals:

|  | 1943 | 1944 | 1945 | 1946 |
|---|---|---|---|---|
| Purebred Cows | 468 | 527 | 519 | 535 |
| Grade Cows | 219 | 209 | 159 | 119 |
| Purebred Heifers | 323 | 326 | 356 | 345 |
| Grade Heifers | 5 | 2 | 3 | 1 |
| Bulls and Bull Calves (On the Estate) | 37 | 46 | 43 | 45 |
| Bulls and Bull Calves (On Option) | 69 | 56 | 59 | 62 |
| Total | 1,121 | 1,166 | 1,139 | 1,107 |

5. During the tax years involved plaintiff's gross sales of milk were

| 1943 | $2,425,548.92 |
|---|---|
| 1944 | 2,935,107.06 |
| 1945 | 3,857,926.12 |
| 1946 | 5,123,659.36 |

6. The cost of the milk produced by the dairy herd owned by plaintiff for the years in question was:

| 1943 | $195,291.59 |
|---|---|
| 1944 | 202,868.31 |
| 1945 | 200,596.33 |
| 1946 | 238,699.01 |
| Total | $837,455.24 |

Plaintiff purchased from outside sources for processing and resale the following amounts during the years involved:

| Year | Amount |
|------|--------|
| 1943 | $ 896,243.24 |
| 1944 | 1,144,768.57 |
| 1945 | 1,688,642.56 |
| 1946 | 2,573,930.79 |
| Total | $6,303,585.16 |

During the years involved in this controversy plaintiff sold the number of animals indicated in the table herein set out:

### Cattle Sales by Years

**Year 1943**

Total Number Sold

| | |
|---|---|
| Under 6 months | |
| Females | 114 |
| Males | 181 |
| Over 6 Mo., under 13 mo. | |
| Females | 3 |
| Males | 7 |
| Over 13 mo., under 16 mo. | |
| Females | 1 |
| Males | 4 |
| Over 16 mo., under 24 mo. | |
| Females | 22 |
| Males | — |
| Over 24 mo. | |
| Females | 67 |
| Males | 4 |
| Total | 403 |

**Year 1944**

| | |
|---|---|
| Under 6 months | |
| Females | 78 |
| Males | 216 |
| Over 6 mo. under 13 mo. | |
| Females | 5 |
| Males | 14 |
| Over 13 mo. under 16 mo. | |
| Females | 1 |
| Males | 8 |
| Over 16 mo. under 24 mo. | |
| Females | 24 |
| Males | 2 |
| Over 24 mo. | |
| Females | 85 |
| Males | 24 |
| Total | 457 |

**Year 1945**

| | |
|---|---|
| Under 6 months | |
| Females | 116 |
| Males | 236 |
| Over 6 mo. under 13 mo. | |
| Females | 38 |
| Males | 16 |
| Over 13 mo. under 16 mo. | |
| Females | 18 |
| Males | 3 |
| Over 16 mo. under 24 mo. | |
| Females | 18 |
| Males | 0 |
| Over 24 mo. | |
| Females | 119 |
| Males | 10 |
| Total | 574 |

**Year 1946**

| | |
|---|---|
| Under 6 months | |
| Females | 85 |
| Males | 209 |
| Over 6 mo. under 13 mo. | |
| Females | 40 |
| Males | 9 |
| Over 13 mo. under 16 mo. | |
| Females | 15 |
| Males | 3 |
| Over 16 mo. under 24 mo. | |
| Females | 3 |
| Males | 1 |
| Over 24 mo. | |
| Females | 132 |
| Males | 11 |
| Total | 508 |

7. Plaintiff at all times since entering the dairy business has maintained an accurate bookkeeping system, showing the value of each of the animals sold above, the price received, the breed, and every other factor which would indicate the exact status of the livestock from the time of its foaling until its ultimate disposition and in addition thereto has kept a full and complete inventory of every single head of its livestock.

8. Plaintiff's breeding practice has always looked toward the idea of having each cow produce a calf approximately every year, and in this manner has kept its milking animals in production and on

a paying basis. Under this formula some 500 to 600 offsprings will be produced annually by the Biltmore herd. Experience indicates that the calves will be divided approximately equally between young bulls and heifers. Some 90–95% of the bull calves are sold to packing houses and other purchasers within a few days following birth for a nominal price of some $2 to $4. This same formula of sale and the prices received therefor applies to heifer calves, which appear to be abnormal and are so found or are defective at birth and therefore not suitable for raising and ultimate inclusion into the herd. Other animals not otherwise disposed of are retained by the plaintiff for its intended purposes.

9. It is generally known that weather, pasturage and breeding conditions affect the herd and for that and other reasons its size will vary from year to year. Yet without regard to those factors good breeding practice seemingly requires that a dairy farmer retain on an average from 25 to 30% of his herd annually so that proper replacements can be effected. Plaintiff follows such practice and on occasion retains a greater percentage.

10. Young bulls under plaintiff's breeding practice, and such apparently is done on a national scale, are bred at the approximate age of eleven months. The heifers on plaintiff's farms are bred at the average age of approximately fourteen to fifteen months, with the hope that each will produce its first calf when she reaches the approximate age of twenty-five to twenty-six months.

11. The animals sold by the plaintiff during the years involved fall under the following heads:

(a) Young animals, principally young bulls, disposed of within a few days after birth, and not involved in this litigation;

(b) Younger animals of desirable blood strain and quality which have been retained by the plaintiff for the production of milk and maintenance of its herds and which prove to be surplus for this purpose;

(c) Those selected from the herd by individual purchasers who wish to acquire a particular bull or cow, or a certain blood strain, and are willing to pay the plaintiff's price for such an animal; and

(d) "Culls" that have outlived their usefulness, have become sterile or for other reasons no longer meet the high standards of the plaintiff's herd.

12. When an occasional sale to an individual customer is to be made the animal sold will not be fully identified until approximately twenty-four hours before the sale is completed.

When the auctions were to be had and plaintiff's animals are placed for sale, they are invariably selected from the general herd. These selections are customarily made about two months or more before the sale. Auction sales of cattle embraced in the plaintiff's herd generally were held at various times beginning in 1941 and continuing even down to this period.

On the foregoing findings of fact one must conclude that the question to be determined here is essentially one of fact. Certainly it is not too easily resolved and it surely requires a close study of the evidence heard as well as a general knowledge of the many physical factors involved in the ownership and development of a dairy herd. It likewise involves a matter of motive. The taxpayer contends and seemingly submits its case on the theory that the provisions of Secs. 117 (j) of the Internal Revenue Code entitle it to have the profit from the sale of its animals of the ages of six to twenty-six months returnable as a long-term capital gain; that the amendment of 1951 clearly so intends and that the amount of recovery sought herein should be allowed.

The defendant contends otherwise, insisting that such sale of plaintiff's cattle is taxable as ordinary income but it does concede that the proceeds from the sale of cows twenty-six months of age and older are entitled to be regarded as capi-

tal gains. It further concedes that any gains from the sale of the bulls over the age of one year are likewise entitled to be classified in the capital gains category, on the theory that they were consistently bred at such age.

The issue seems to be at what point in the taxpayer's operations are the animals added to the dairy herd and when do the bulls become a part of the breeding herd and therefore become "property used in the trade or business."

Rulings of the Treasury Department and court opinions made and decided prior to the amendment of 1951 are in many instances at variance one with the other and are somewhat conflicting. The amendment among other things provided "property used in the trade or business," and further includes "Livestock regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for six months or more from the date of acquisition." It was made applicable to taxable years beginning as of December 31, 1941, with the holding period extended from six to twelve months applicable only to years beginning after December 31, 1950. Hence the holding period in this case is listed at six months.

A number of cases have dealt with a like inquiry and each as been determined on the facts involved. Among these is Fox v. Commissioner of Internal Revenue, 4 Cir., 198 F.2d 719, from this circuit. Another well-reasoned opinion is McDonald v. Commissioner of Internal Revenue, 2 Cir., 214 F.2d 341. Another is United States v. O'Neill, 9 Cir., 211 F.2d 701. The last case called to my attention is Gotfredson v. Commissioner of Internal Revenue, 6 Cir., 217 F.2d 673. The Fox case and the Gotfredson case arrive at the same conclusions and under much the same line of reasoning, but based upon a different factual situation. The McDonald case presents facts comparable almost wholly with those found in this case and is most persuasive. Under the doctrine of stare decisis I am moved to adopt the conclusions listed in the Fox case, supra, as being the law applicable to the Fourth Circuit and thereupon make the following conclusions of law:

### Conclusions of Law.

1. This court has jurisdiction under Sections 1340 and 1346, Title 28 United States Code.

2. The plaintiff has fulfilled the jurisdictional prerequisites for the institution and maintenance of this suit.

3. Those heifers sold before they reached the age of 24 months and bulls sold before they reached the age of 11 months are not a part of the dairy herd since they were sold before they became a part of or could be used in the dairy business. Hence the animals sold did not constitute a capital asset within the meaning of Section 117(j), as amended. Accordingly the proceeds from the sale of the cattle within the ages herein found are properly includible in the ordinary income of the plaintiff.

4. Those heifers, whether raised or purchased, over 24 months and bulls over 11 months did constitute capital assets within the meaning of Section 117(j) and therefore proceeds from the sale thereof are properly returnable at capital gain rates.

5. The plaintiff has failed to establish the allegations in its complaint by a preponderance of the evidence.

6. The plaintiff is entitled to have and recover from the defendant with interest as the law provides, in the matter of refunds of the United States income tax, such funds herein as will be determined upon a recomputation and redetermination of plaintiff's income tax liabilities for the years herein.

Decree will be presented carrying into effect this judgment.