**The BILTMORE COMPANY,**
Appellant,

v.

**The UNITED STATES of America,**
Appellee.

**No. 7061.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 18, 1955.

Decided Dec. 2, 1955.

Joel B. Adams, Asheville, N. C. (Adams & Adams, Asheville, N. C., on brief), for appellant.

C. Guy Tadlock, Attorney, Department of Justice, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and John K. Clifford, Attorneys, Department of Justice, Washington, D. C., and James M. Baley, Jr., U. S. Atty., Asheville, N. C., on brief), for appellee.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and BRYAN, District Judge.

BRYAN, District Judge.

This case involves the determination of the character, as ordinary income or capital gain for Federal tax purposes, of profits from the sale of livestock. The decisive question is whether bull-calves between six and eleven months of age, and heifer-calves between six and twenty-four months old raised and sold by the appellant, a dairy cattle herder, were "property held * * * primarily for sale to customers in the ordinary course of * * * trade or business" or were "property used in * * * trade or business". The District Court held, 129 F.Supp. 366, the profits were not capital gains and we agree. Accordingly, we approve the judgment below denying The Biltmore Company, the appellant, recovery of the additional Federal income

taxes it paid for 1943, 1944, 1945 and 1946, by reason of the assessment of these profits as ordinary income instead of as capital gain.

The Biltmore Company is a corporation and operates the Biltmore Dairy Farms. It has clearly shown that in the tax years it was not primarily a beefmaker or breeder, and maintained its herd of cows just for commercial milk production. Indisputably such a herd is a capital asset. But we do not find sustained in the evidence the major premise of appellant's argument—that the calves it sold were from birth intended to provide replacements in its dairy herd and were, therefore, always a potential part of the herd.

In each of the tax years the Biltmore herd contained, on an average, 1133 head of dairy cattle, Jersey and Guernsey strain. Of these an average of 689 were cows of milking age and the remainder consisted of heifer-calves, heifers, bullcalves and bulls. For constancy of milk production and maintenance of the herd Biltmore aimed to have each cow calve every year; the annual increase normally was found to be between 500 and 600 offspring. Younglings are generally equally divided between male and female. When only a few days old 90–95% of the bull-calves were regularly sold to the packers; similar immediate disposition was made of such of the heifer-calves as then appeared to be abnormal, defective, or otherwise undesirable for raising. The others were retained and raised: the heifer-calves to grow into heifers and, through being bred, to become cows, themselves bearing calves and thereby producing milk, the bull-calves to mature into bulls and become sires in the herd.

Appellant did not breed its bulls until they were eleven months old or its heifers before they attained fourteen or fifteen months. As nine months is the gestation period, the heifer would not drop her calf and become a milker until she was approximately twenty-four months of age. Thus, eleven for bulls and twenty-four months for heifers were the ages adopted by the trial judge in fixing the times of their entry into the herd. It is the bull-calves between six and eleven months and the heifers between six and twenty-four months, sold in the tax years, that are the subject of the present controversy. Those sold before they reached six months, the taxpayer admits, could not be capital assets; bulls sold after reaching one year, and cows after reaching twenty-six months, were conceded by the United States to be capital items. The Government has not appealed in respect to the bulls sold between the age of eleven months and one year, or as to the heifers between twenty-four and twenty-six months.

Governing here is the Internal Revenue Code of 1939, as amended, sections 117(j) (1) and (2) [1] and the Revenue Act of 1951, section 324, amending 117 (j) (1), I.R.C.[2] As applicable these are the terms of 117(j) (1):

"For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is * * * held for more than 6 months, * * * which is not * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *."

By section 324, Revenue Act of 1951, retroactive to the present tax years, pertinent additions to 117(j) (1) were enacted as follows:

"Such term [property used in the trade or business] also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 [made 6 for taxable years prior to 1951] months or more from the date of acquisition."

1. 26 U.S.C. (1946 ed.) § 117(j) (1) and (2), 26 U.S.C.A. (I.R.C.1939) § 117(j) (1) and (2).

2. 26 U.S.C. (1952 ed.) § 117(j) (1) and (2), 26 U.S.C.A. (I.R.C.1939) § 117(j) (1) and (2).

Biltmore's point, enlarged, is this: that whether or not an animal is "used in the trade or business" depends upon the purpose for which it is, "regardless of age, held"; that use-in-fact and age were never conclusive gauges for ascertaining the tax-classification of livestock; that good dairy husbandry demanded the retention by appellant of all its calves six months on as recruits for the herd; that the recruits were not and could not be sold unless and until it was ascertained they would not be needed as replacements in the herd; and that, as recruits, they were a part of, or "held", for the herd though they had not joined it as producers.

Contrary to the interpretation of the appellant, we do not understand that, in determining whether the animals should be classed as capital or stock in trade, the District Judge held that Fox v. Commissioner, 1952 in this court, 198 F.2d 719, compelled the classification to be made, as a matter of law, on the sole basis of the ages of the cattle sold. It appears to us that he approached the proper classification as a factual issue dependent upon many considerations. Indeed, he cited Fox as precedent therefor. He noted a possible conflict between our construction and the Second Circuit's in McDonald v. Commissioner, 1954, 214 F.2d 341, of the "held * * * for" and "used" phrases of section 117(j) (1) when apposed to livestock. Only in this connection did he invoke the doctrine of stare decisis, never in the sense that Fox bound him to range the animals by age.

On the evidence there was ground enough for the District Judge to find that these head, when sold, were not in fact within the herd, the capital unit. The herd was an entity producing, or causing the production of, milk; it comprised the cows in-calf or in-milk and the bulls ready for service. Obviously the animals in dispute had never reached the stage of productivity. However, explains Biltmore, experience had proved that each year 25% to 30% of its milking or productive herd would be lost through injuries, fatalities, or sterility. Biltmore points out that this is the contingency the additional animals were held to meet; and that, in this stand-by role, they were so immediately a potential of the herd as to be considered in it. But, we find, Biltmore's experience had also proved that in none of the tax years were these animals needed. They were sold simply to avoid overstocking; for it was quite plain that not only would they not be required for the herd, they would never be required for the reserve. A surplus of animals, equal in quality and to the number sold, was readily identifiable from the time the annual calf crop was dropped. Aware of the number of new calves reasonably to be expected yearly and of the reserve to be maintained, the dairyman knew before the calves came there would be this excess and that he would not raise them for producers. Biltmore's livestock schedules confirm the superabundance of the cattle sold.

Sales of this age-class during 1943 were, at the most, 37 head; at the end of that year there were 687 cows of milking age and 328 heifers. At the same time there were 37 bulls and bull-calves (the number of each is not shown in the record) on the estate and 69 "on option", that is, placed elsewhere on loan. There is no intimation that the 328 heifers, the number left after the sale, did not afford an ample reserve for the 687 cows or that the males were not equally well secured against depletion, though the producing herd should suffer losses far above 30%. In the other years the ratio is no less. That a most conservative margin remained is proved, too, by noting the number of the new calves still available, on an average each year, as replacements after the average annual sale was made of the type of animals in question. With a total of 255 sold in the four years, the annual average sale was 64; the producing herd averaged 689; the heifer-calves arriving each year numbered about 275 (550 calves in all, one-half heifers); replacement of 30% of the producing herd (689) required 207 heifer-calves each year; this left 68 (275–207) not needed for the reserve,

hence never for the herd; and the taxpayer sold annually, on an average, less than this surplus of 68. If the sales for the period were 234, as stated at the bar, and not 255 as appears in the record, the overplus of the animals sold is the more evident.

As it was always known that these animals, or their equivalents in number and quality, would never be called into the herd, we do not encounter the ruling made by the Second Circuit in the McDonald case, supra, 214 F.2d 341, upon which the appellant relies. There the dairy cattle were sold for failing to "measure up to the high standards" of the herd; otherwise, the inference is, they would have been retained. Nevertheless, they were born to be herded as producers and only the after-development of undesirable characteristics diverted them. The Court decided that, although they had never been used as breeders and were under twenty-four months, yet as they were from the beginning raised for the herd, this purpose classified them as "held by the taxpayer for * * * breeding" and thus a capital asset from birth. As already observed, we do not have that factual situation here.

We think the District Court's findings are well undergirded by the evidence, its conclusions sound in law.

Affirmed.