M. P. MOORE AND ANNIE LOUISE F. MOORE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59848. Filed January 16, 1959.

*W. C. Keady, Esq.,* and *Roy D. Campbell, Jr., Esq.,* for the petitioners.

*Lester R. Uretz, Esq.*, for the respondent.

TIETJENS, *Judge:* This proceeding involves deficiencies in income tax in the amounts and for the years set forth below:

| Year | Deficiency |
|------|-----------|
| 1951 | $30,495.32 |
| 1952 | 32,484.02 |
| 1953 | 42,142.60 |

The only issue for decision is whether cattle sold by petitioners during the years in issue were held primarily for sale to customers in the ordinary course of business, or were held for breeding purposes within the meaning of section 117(j)(1) of the 1939 Code.

Other issues raised by the pleadings have been conceded.

### FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

During the years in issue, M. P. and Annie Louise F. Moore (hereinafter referred to as the petitioners), husband and wife, resided in Senatobia, Mississippi. They filed their joint Federal income tax returns for the year 1951 with the collector of internal revenue for the district of Mississippi, and for the years 1952 and 1953 with the district director of internal revenue for the district of Mississippi.

Throughout the years in issue, petitioners' principal occupation was farming and raising Polled Hereford cattle, a business which they conducted under the name of the Circle M Ranch. Their cattle business encompassed two separate and distinct operations, one of which was the development, maintenance, and expansion of a prime breeding herd, and the other the sale of breeding cattle to other breeders in the ordinary course of business. Their ranch properties extended over some 4,800 acres of land, of which 1,452 acres were devoted to pasture. An additional 388 acres had been developed for pasture, but were not in use during the years in issue.

Petitioners began raising Polled Herefords in 1939 with the purchase of 35 head of cattle. As of the close of 1950, they owned some 480 head. More than 90 per cent of the increase in their cattle inventory was the result of calves born on the Circle M Ranch which had been maintained in the breeding herd.

From the onset of their cattle-raising endeavors, petitioners have worked continually towards the improvement of their breed by the careful development of a prime breeding herd. Through the use of selective breeding practices, they have been able to develop an animal with an additional 4 inches in its hindquarters and a shortened girth, thereby increasing the commercial value of its carcass some 10 to 30

per cent. Their ultimate goal has been the perfection of such a highly bred animal that it will pass on to its offspring its fine characteristics regardless of the animal to which it is bred.

As a result of petitioners' efforts, Circle M Ranch cattle are recognized as one of the top herds of registered Polled Herefords in the United States. In 14 years of national competition, through the years here in issue, Circle M Ranch produced 15 national and reserve champions, won the best 6 head award 7 times, took first prize in the get-of-sire competition 6 times, and was premier exhibitor 7 times.

All of petitioners' Hereford cattle were registered with the American Hereford Association, and the American Polled Hereford Association. Those associations register only those animals whose sire was at least 12 months old and whose mother was at least 15 months old at the time of breeding.

Basically, petitioners divided their herd into 3 groups: Their breeding herd, their replacement herd, and their sale herd. Their breeding herd was composed of their mature cows and their herdsires. Their replacement herd was composed of their replacement heifers, and their replacement bulls. Their sale herd was divided into 2 groups designated: for-sale bulls and for-sale heifers. The for-sale bulls and heifers were accessible to the public at all times in order that they might be inspected by prospective purchasers. Sale sheets were maintained for the convenience of the public showing the name, age, ancestry, and price of all the animals in the for-sale lots.

During the years in issue, petitioners had an annual crop of 228 calves. At birth, each calf was inspected and closely analyzed. Those with horns or other gross defects apparent at that time which rendered them unsuitable for use in the breeding herd, were disposed of as soon as it was reasonable to remove them from their mothers. Calves with outstanding family backgrounds from the breeding standpoint were taken to the junior nurse barn where they were given special attention and milk from Holstein nurse cows. The remainder of the calves were left at their mothers' sides until weaning.

At weaning, which occurred during their fourth to seventh month, the calves were subjected to a second detailed examination. The purpose of that examination was to determine objectively on the basis of bloodlines, physical appearance, family characteristics, and performance of ancestors, which calves then measured up to breeding herd standards, and which did not. All female animals which passed that inspection were put in the replacement heifer pasture; those which did not were put in the for-sale heifer pasture. Because of the demanding standards set by petitioners only 10 to 25 male calves were retained from the annual calf crop each year as junior herdsires, and were put

in the replacement bull lot. The remainder were placed in the for-sale bull lot.

While at weaning a negative determination could be made as to which animals were not suitable at that time for use in the breeding herd, it was not always possible conclusively to determine which animals would at all events prove suitable for that use. Therefore, petitioners continued to make frequent inspection of those animals in the replacement heifer and bull lots. Any animals held in those groups which had not yet attained the age of 12 months, and which developed characteristics which in petitioners' judgment made them unfit for breeding purposes, were removed from the replacement groups and were placed in the for-sale groups.

Petitioners treated the for-sale animals differently from those in the replacement groups in the following respects:

*Feeding.*—The sale animals were fed once a day on low-cost feed and available silage and grass. On the other hand, the replacement heifers were pastured on mineralized pasture land, and were fed 3 times daily with choice feed, receiving additional milk whenever necessary. The junior herdsires were cared for in individual barns, where they were pan fed so that maximum control of their feeding might be obtained.

*Supervision.*—The sale animals were seen only briefly by the helpers who fed them and by prospective purchasers. The replacement group animals, on the other hand, were inspected twice daily. Replacement heifers were given constant attention with respect to their breeding organs and other physical characteristics. The junior herdsires were brushed daily, and were similarly scrutinized for physical development. They were exercised daily by handlers in special exercise paddocks.

*Breeding.*—For-sale bulls were not permitted to breed while at Circle M Ranch. On the other hand, for-sale heifers were bred as soon as they came of age. That breeding was accomplished by bringing a herdsire into the for-sale heifer pasture to service the heifer. Then the herdsire was immediately returned to his pen. Animals in the replacement groups were bred as they became of age.

*Availability for Sale.*—So long as the animals were held in the replacement groups they were not for sale, nor were they subject to inspection by prospective buyers. On the other hand, the animals in the for-sale groups were always held for immediate sale, and were subject to constant inspection.

Until bred, those animals in the replacement heifer pasture remained there. After breeding they were transferred to the mature cow pasture.

Petitioners always used a highly selective system of paddock breeding of their animals. No open or pasture breeding was permitted.

Matings between particular animals were predetermined on the basis of research and experimentation, the constant aim being to improve the breed of their herdsires. Due to the variations obtainable because of petitioners' highly selective breeding program, they required the services of a larger number of herdsires than would have been necessary had open or pasture breeding been allowed. Set forth below are the number of herdsires petitioners had in service in their breeding herd during the years 1950 through 1953:

| Year | Herdsires |
|------|-----------|
| 1950 | 27 |
| 1951 | 32 |
| 1952 | 34 |
| 1953 | 34 |

To publicize the quality of their herd, petitioners entered the finest animals in their breeding herd in various national cattle shows and exhibitions which were held throughout the United States. There was no intention to sell the exhibited animals at the fairs and none were sold there. However, some of the exhibited animals were later sold. In the main, most of the show animals were permanently retained in petitioners' breeding herd. None of the animals shown were allowed to breed until the end of the show season, and therefore, most had a minimum breeding record.

During February of each year, petitioners conducted a public cattle auction at the Circle M Ranch, at which they sold animals obtained from the mature cow pasture, the herdsire pens, the replacement heifer pasture, and the replacement bull lot. In early January, petitioners made a careful inspection of all the animals maintained in those areas, designating for sale those which had developed undesirable characteristics which they did not wish compounded in their breeding herd. While some of those animals could have been used for breeding purposes, petitioners felt to do so would add nothing in the way of improvement to their herd. Though the animals designated for sale did not measure up to the standards set by petitioners for their breeding herd, they invariably would serve to improve the herd of any other breeder. The prices at which the animals sold were arrived at through competitive bidding over which petitioners maintained no control. The average attendance at the annual auction was between 1,500 and 2,500 people. The auctions held during the years in issue were respectively billed as the tenth, eleventh, and twelfth annual sales.

As soon as the cattle to be sold had been chosen, petitioners prepared a printed catalog to be used in conjunction with the auction. That catalog contained a picture of each animal offered for sale, under which appeared its general description, a three-generation pedigree, the date calved, its identification, and, in the case of females, whether bred or

not, and the bull bred to. Approximately 2,500 copies of that catalog were distributed throughout the United States and abroad. They were particularly sent to some 1,000 prior customers, and also to various American universities and research institutions to serve as reference booklets for Circle M Ranch cattle.

In addition to distributing those catalogs, petitioners advertised the February auction in various national and international trade journals. During each of the years in issue, no fewer than 11 trade journals and at least 1 newspaper carried advertisements of the Circle M Ranch's February sale. Those advertisements appeared during the period from January 1 to February 1 of each year.

During 1951, petitioners sold a total of 140 head of cattle. The gain on the sale of 85 of those animals was returned as ordinary income. Fifty-four of the remaining 55 head were sold at auction on February 19, 1951, and 1 was sold at private treaty. The gain on the sale of all 55 head was returned as a long-term capital gain. Respondent did not disturb petitioners' treatment of the gain on 1 of those animals, but determined that the gain on the remaining 54 represented ordinary income. All 54 head had been held by petitioners 12 months or more. Set forth below is the number, sex, age, breeding record, inventory value, and sale price of the 54 animals in issue for 1951.

| Number | Sex | Age | Number of animals | | Inventory value | Sale price |
|---|---|---|---|---|---|---|
| | | | Bred | Unbred | | |
| 21 | Bulls | 16–34 months | [1] 8 | [2] 13 | $6,325 | $152,750 |
| 33 | Heifers | 14–33 months | [3] 30 | 3 | 13,685 | 96,650 |
| | Total | | | | | 249,400 |

[1] One bull bred 17 times, 1 bull bred 8 times, 1 bull bred 5 times, 1 bull bred 4 times, 2 bulls bred 3 times each, and 2 bulls bred once each.
[2] Of the 13 sold unbred, 6 had either been prepared for show or had actually been shown.
[3] All 30 head had been bred only 1 time each.

Six of the 21 bulls had been carried in petitioners' inventory of herd-sires which had been used in their breeding herd for 1950, and 4 others were carried in that inventory for 1951. An additional 4 bulls had either been prepared for show or had been actually shown. Seven heifers had either been prepared for show or had actually been shown, and 2 others were purchased in 1949.

During 1952, petitioners sold a total of 125 head of cattle. The gain on the sale of 62 of those animals was returned as ordinary income. The gain on the sale of the remaining 63 head was returned as a long-term capital gain. Respondent did not disturb petitioners' treatment of the gain on 22 of those 63 animals, but determined the gain realized on the remaining 41 represented ordinary income. All

41 head had been held by petitioners for 12 months or more. Thirty-eight of those animals were sold at auction on February 18, 1952, and 3 were sold at private treaty. Set forth below is the number, sex, age, breeding record, inventory value, and sale price of the 41 animals in issue for 1952.

| Number | Sex | Age | Number of animals | | Inventory value | Sale price |
|---|---|---|---|---|---|---|
| | | | Bred | Unbred | | |
| 12 | Bulls | 20–28 months | [1] 10 | [2] 2 | $4,400 | $103,700 |
| 29 | Heifers | 17–25 months | [3] 26 | 3 | 10,675 | 90,000 |
| | Total | | | | | 193,700 |

[1] One bull bred 12 times, 1 bull bred 8 times, 1 bull bred 5 times, 1 bull bred 4 times, 2 bulls bred 3 times, 1 bull bred 2 times, and 3 bulls bred 1 time each.
[2] Both bulls sold unbred had either been prepared for show or actually had been shown.
[3] Twenty-five bred only 1 time each, 1 bred twice.

Seven of the 12 bulls had been carried in petitioners' inventory of herdsires which had been used in their breeding herd for 1951, and 1 other had been carried in that inventory for 1952. An additional 3 bulls had either been prepared for show or had actually been shown. Eight heifers had either been prepared for show or actually been shown, and 2 others had been purchased by petitioners.

During 1953 petitioners sold a total of 158 head of cattle. The gain on the sale of 70 of those animals was returned as ordinary income. The gain on the sale of the remaining 88 head was returned as a long-term capital gain. Respondent did not disturb petitioners' treatment of the gain on 32 of those 88 animals, but determined the gain on the remaining 56 represented ordinary income. All 56 head had been held by petitioners for 12 months or more. Fifty-one of those animals were sold at auction on February 16, 1953, and 5 were sold at private treaty. Set forth below is the number, sex, age, breeding record, inventory value, and sale price of the 56 animals in issue for 1953.

| Number | Sex | Age | Number of animals | | Inventory value | Sale price |
|---|---|---|---|---|---|---|
| | | | Bred | Unbred | | |
| 18 | Bulls | 19–31 months | [1] 13 | [2] 5 | $20,000 | $219,400 |
| 38 | Heifers | 15–33 months | [3] 35 | 3 | 9,750 | 110,025 |
| | Total | | | | | 329,425 |

[1] One bull bred 8 times, 1 bull bred 4 times, 2 bulls bred 3 times each, 3 bulls bred 2 times each, and 6 bulls bred once each.
[2] Of the 5 bulls sold unbred, 2 had been prepared for show or had actually been shown.
[3] All 35 head bred once only.

Ten of the 18 bulls had been carried in petitioners' inventory of herdsires which had been used in their breeding herd for 1952, and 1 other had been carried in that inventory for 1953. An additional 3 bulls had

either been prepared for show or had actually been shown. Nine heifers had either been prepared for show or had actually been shown, and 3 others had been purchased during 1951.

All but 7 of the 151 head of cattle in controversy had been born and raised on the Circle M Ranch. Those 7 head had been purchased by petitioners and held by them for 12 months or more from their dates of acquisition before being sold. Petitioners only purchased animals to improve their breeding herd bloodlines, and never purchased them for resale.

Set forth below are the number of animals born, purchased, sold, or died on the Circle M Ranch during each of the years in issue, and the actual number of cattle held at the close of each of those years.

| Year | Births | | Purchases | | Sold | | Died | | On hand | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female | Male | Female | Male | Female | |
| 1951__ | 109 | 89 | 0 | 37 | 65 | 75 | 21 | 57 | 131 | 366 | 497 |
| 1952__ | 160 | 119 | 0 | 18 | 57 | 68 | 22 | 18 | 212 | 417 | 629 |
| 1953__ | 101 | 109 | 2 | 25 | 59 | 99 | 27 | 18 | 229 | 434 | 663 |

Petitioners incurred certain general advertising expenses in connection with the operation of the Circle M Ranch. Those expenses consisted of the cost of local advertising, and miscellaneous entertainment expenses not connected with the annual auction. Set forth below are the expenses so incurred for the years in issue.

| Year | Amount |
|---|---|
| 1951 | $1, 917. 00 |
| 1952 | 9, 753. 92 |
| 1953 | 5, 312. 51 |

Petitioners further incurred, during the years in issue, show and sale expenses with respect to the cattle which they exhibited and those which they sold at auction in the following amounts:

| Year | Amount |
|---|---|
| 1951 | $18, 872. 41 |
| 1952 | 22, 709. 31 |
| 1953 | 32, 724. 53 |

Approximately one-half those amounts was expended in the course of exhibiting the cattle throughout the United States. The remainder was directly connected with the annual auction, and included the cost of entertainment, catalogs, and miscellaneous printing.

Petitioners maintained complete individual records of all their cattle from birth, assigning to each animal a recorded name, tattoo number, neck chain number, and ledger page number. The date of birth, ancestry, and registration number of each animal were also recorded. However, separate records were not kept for the breeding herd as

a unit. The only records maintained for the sale herd as such were the temporary sales sheets which listed the animals for sale and their price.

On their returns for the years in issue, petitioners returned the following gross proceeds from cattle sales as either ordinary income or long-term capital gain.

| Year | Ordinary income | | Long-term capital gain | |
|---|---|---|---|---|
| | Number of head | Amount | Number of head | Amount |
| 1951 | 85 | $184,428.00 | 55 | $128,725 |
| 1952 | 62 | 106,885.15 | 63 | 214,200 |
| 1953 | 70 | 47,453.04 | 88 | 311,037 |

For each of the years in issue, petitioners returned the following net losses from the operation of the Circle M Ranch.

| | |
|---|---|
| 1951 | ($71,613.36) |
| 1952 | (82,975.63) |
| 1953 | (205,393.06) |

For the year 1951, respondent determined that all the cattle sold, with the exception of 1 nurse cow sold for $250, constituted stock in trade of petitioners' business of raising high-grade Polled Hereford cattle for profit; that they were sold in the ordinary course of that business; and that the gain on their sale was returnable as ordinary income. Accordingly, he increased the gross receipts from cattle sales reported as ordinary income by the amount of $128,475, and correspondingly decreased gross receipts from the same sources reported as long-term capital gains.

For the year 1952, respondent determined that all the cattle sold, with the exception of 22 head, constituted stock in trade of petitioners' business of raising high-grade Polled Hereford cattle for profit; that they were sold in the ordinary course of that business; and that the gain on their sale was returnable as ordinary income. Accordingly, he increased gross receipts from cattle sales reported as ordinary income by the amount of $178,048.33, and correspondingly decreased gross receipts from the same sources reported as long-term capital gains.

For the year 1953, respondent determined that all the cattle sold by petitioners, with the exception of 32 head, constituted stock in trade of petitioners' business of raising high-grade Polled Hereford cattle for profit; that they were sold in the ordinary course of that business; and that the gain on their sale was returnable as ordinary income. Accordingly, he increased gross receipts from cattle sales reported as ordinary income in the amount of $324,213.03,[1] and correspondingly

---

[1] An error occurring on petitioners' return accounted for $19,650 of that increase.

decreased gross receipts from the same source reported as long-term capital gains.

Of the 151 animals here in issue 70 were, at the time of their sale, held by petitioners for breeding purposes.

OPINION.

The issue is whether the 151 head of cattle in controversy were held by petitioners for breeding purposes at the time of their sale within the meaning of section 117(j)(1)[2] of the 1939 Code, so as to constitute the gain realized thereon a long-term capital gain.

Whether or not an animal is held for breeding purposes is a question of fact. *Biltmore Company* v. *United States*, 228 F. 2d 9 (C.A. 4, 1955); *Gotfredson* v. *Commissioner*, 217 F. 2d 673 (C.A. 6, 1954), affirming a Memorandum Opinion of this Court dated August 31, 1953, certiorari denied 350 U.S. 846 (1955). While actual use is undoubtedly the best indication of the purpose behind an animal's retention, it is by no means conclusive. *James M. McDonald*, 23 T.C. 1091 (1955). On the other hand, something more than a mere declaration on the taxpayer's part that he considered an animal to be a part of his breeding herd is required. *John L. Clark*, 27 T.C. 1006 (1957). Most often the answer lies between the two extremes; that is, where the taxpayer's declaration that he is holding an animal for breeding purposes is supported by his treatment of that animal in the course of his everyday operations, he is entitled to report his gain on the sale of the animal as capital gain rather than as ordinary income.

Respondent contends that petitioners' principal business was selling registered Polled Hereford breeding cattle; that all the animals in issue were sold by them in the ordinary course of that business; and that the gain realized on their sale was taxable as ordinary income. He argues that the record fails to establish that these animals were held for breeding purposes, maintaining that petitioners' mere designation of the better portion of their annual calf crop as replacements for their breeding herd is not sufficient to make them a part thereof for the purposes of section 117(j)(1). Furthermore, he claims there is no showing of what portion of those replacements ever found their way

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EX-CHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * * Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. * * *

into the breeding herd. Finally, he submits petitioners' operation is nothing more than a cleverly devised system of livestock segregation intended to afford them the opportunity of obtaining preferential capital gains treatment on the sale of their more valuable animals, a result never intended by Congress.

On the other hand, petitioners contend their business had two distinct phases; one being the sale of registered cattle to breeders in the regular course of business, and the other being the building, maintenance, and expansion of a breeding herd which would consistently produce a better beef animal. They maintain their annual calf crop was committed at weaning to either the breeding or the sale herd, depending upon whether or not they met breeding herd standards. Because it was not always possible to determine conclusively at weaning whether an animal would in all events prove to be a successful breeder, petitioners submit that subsequent inspections of those animals committed to the breeding herd were necessary, as a result of which the animals having after-developed characteristics which would tend to retard the breeding herd improvement program were withdrawn from that herd and sold. It is their present position that the animals here in issue were culled from the breeding herd as a result of those subsequent inspections, and that therefore they were held at the time of their sale for breeding purposes within the meaning of the statute.

Inherent in petitioners' argument is the contention that their replacement herds were a subdivision of their breeding herd, and that the mere act of placing an animal in either replacement herd was indicative of an intention on their part that the animal was thereafter to be held for breeding purposes unless it should subsequently prove unfit for that use. Inasmuch as a substantial number of the animals in issue were at the time of their sale held in one or the other of the replacement herds, we have given careful consideration to this claim. After an exhaustive review of the record we are of the opinion that it lends little support to that contention.

At the outset, we are struck by the terms employed by petitioners to describe the animals held in these herds. If, as contended, they were truly a part of the breeding herd, we do not understand their classification as "replacements." The term replacement would seem more appropriately to describe an animal which had not as yet been committed to any particular use, but which was being held in reserve should a need for its use subsequently arise. Or, stated differently, a replacement animal was the most likely candidate for the breeding herd, and would be channeled into that herd should it subsequently be needed. Furthermore, not only were different terms used in describing the animals in the replacement herds and the breeding herd,

but they were pastured in different lots as well. While we are aware of the fact that a heifer once bred was placed in the mature cow pasture, the record fails to reveal by what method the replacement bulls attained the rank of herdsire. Thus it would appear that the distinction between replacement herd animals and breeding herd animals was more than one in name alone.

Petitioners attach great significance to the method by which they divided their annual calf crop at weaning between the sale and replacement herds. While there is no question that the animals which were retained in the replacement herds were far superior to their less fortunate companions, the mere act of division in no way establishes that the replacement animals were thereafter held for breeding purposes. In point of fact, the record reveals that the disposition of inferior animals was a continuous process, and we see no reason to give more weight to the dispositions which occurred at weaning than we would to those achieved each year through the medium of the annual auction. Each was but a part of a series designed to eliminate those animals which failed to meet the standards of petitioners' breeding herd. The question is not whether inferior animals were disposed of, but is rather, whether the animals which were retained were held for breeding purposes. We are of the opinion that something more than a division along established lines of inferiority must be shown in order to corroborate a claim that these retained animals were held for breeding purposes.

Petitioners next direct our attention to the special care which was given the animals in the replacement herds. The record indicates that the replacement herd animals, in contrast to the sale herd animals, were carefully fed, inspected, and supervised. However, we are unable to overlook the very obvious fact that the more specialized the treatment afforded these animals, the greater the return which would be realized in the event of their sale. While this fact alone does not completely offset the thrust of petitioners' argument, it does to a marked degree detract from its efficacy. Suffice it to say that in the light of this record petitioners' specialized treatment of the animals in the replacement herds does not appear to us to be a sufficient basis upon which to conclude that they were held primarily for breeding purposes.

As we view it, the distinguishing factor in this case is that petitioners were not only among the most accomplished breeders in their field, but also were successfully engaged in the profitable business of selling breeding cattle. As a result, the major portion of their annual income was derived from the sale of breeding cattle to other breeders. On the basis of that fact, it would appear that their principal occupa-

tion was that of raising breeding cattle for sale in the ordinary course of business. While any success achieved in that endeavor was dependent in part upon the excellence of their breeding herd, we are unable to agree that that should warrant a conclusion that petitioners' principal efforts were directed towards the maintenance and improvement of their breeding herd. In our judgment, petitioners were interested in maintaining a top breeding herd primarily to insure a supply of quality breeding animals which could be profitably sold to other breeders in the ordinary course of business. On this record any other conclusion would be a case of the tail wagging the dog. Therefore, petitioners' reliance upon our decision in *James M. McDonald, supra*, is misplaced. There we were persuaded by the evidence that the taxpayer's efforts were devoted singularly towards the improvement of his breeding herd, even to the point of sustaining continual losses from his operations. In that posture of the case, we were convinced that the animals sold were disposed of due to their failure to meet herd standards, and that the animals retained were held solely for breeding or dairy purposes. However, it was noted, in a concurring opinion, that the result there reached might have been different had the point been made that "the petitioner's business was essentially that of selling high-grade Guernseys for profit and his dairy business subordinate." It is that very point, namely that petitioners' business was essentially that of selling Polled Hereford breeding cattle, which here prevents us from concluding that the mere retention of an animal sufficiently evidenced an intention that it was being held for breeding purposes.

We are therefore unable to agree with petitioners that their replacement herds were a subdivision of their breeding herd, and that the fact that an animal was held in either of the replacement herds conclusively establishes that it was being held for breeding purposes. Hence, we must hold that petitioners have failed to prove that the portion of the animals in issue which were held, immediately before sale, in either of the replacement herds were held for breeding purposes within the meaning of the statute.

However we note that not all the animals in issue were obtained from the replacement herds prior to their sale. Of the 51 bulls here in issue, 29 were carried in petitioners' inventory of herdsires which had been used in their breeding herd, which conclusively indicates that they had been held by petitioners for breeding purposes. Of the remaining 22 male animals, 10 had either been shown at exhibition or had been prepared for showing. The record establishes that petitioners, to publicize the quality of their herd, only entered the finest animals in their breeding herd in the various cattle exhibitions held

throughout the United States. It is therefore apparent that these 10 animals were also held by petitioners for breeding purposes. Cf. *Estate of C. A. Smith*, 23 T.C. 690 (1955). Of the 100 heifers in issue, a total of 24 either had been shown at exhibition or had been prepared for showing, and an additional 7 animals had been purchased at one time or another by petitioners to improve their breeding herd bloodlines. We have therefore concluded that each of these 31 heifers was held by petitioners for breeding purposes at the time of their sale. Thus on the basis of actual use, we are of the opinion and have found as a fact that 70 of the 151 animals in issue were held by petitioners for breeding purposes at the time of their sale.

Anticipating we might conclude that not all the animals in issue were held for breeding purposes, petitioners, in the alternative, contend that the 65 heifers which had been bred prior to its sale, on the basis of actual use, should be regarded as having been held for breeding purposes. We are unable to agree. While it is true that those animals had actually been bred, only one of the 65 had been bred more than once. In the light of the fact that it was petitioners' practice to breed all female animals as soon as age would permit, and the fact that a heifer bred to a Circle M Ranch bull would be more valuable to a purchaser than one sold "open," and the further fact that once an animal had conceived her fertility had been established, we cannot say that the mere breeding of the 65 animals established that they were actually held by petitioners for breeding purposes.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: Moore was engaged in this business for profit and not as a mere hobby for his personal satisfaction. His profits are realized through sales. He obviously was holding most of his animals for sale to customers in the ordinary course of his business. The Commissioner's determination is presumed to be correct and the burden is upon Moore to show that each animal sold was not held for sale to customers in the ordinary course of business but was held primarily for breeding purposes, if the Commissioner taxed the gain on that sale as ordinary income. The best evidence of the primary purpose for which any particular animal was held is what he did with it. If he actually used it for breeding, that fact would probably be determinative, but if he never actually used it for breeding, then the fact that he sold it would best indicate his principal purpose in holding it. I would then tax as ordinary income the gain from the animals shown and sold if they were never actually used for breeding purposes.

TRAIN, *J.*, agrees with this dissent.