M. P. MOORE and Annie Louise F. Moore, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. DC6346.

United States District Court
N. D. Mississippi,
Delta Division.

Sept. 30, 1965.

Keady, Campbell & DeLong, Greenville, Miss., for plaintiffs.

H. M. Ray, U. S. Atty., Oxford, Miss., J. W. Watkins, III, Tax Division, U. S. Department of Justice, Washington, D. C., for defendant.

CLAYTON, District Judge.

This action was brought by plaintiffs, M. P. and Annie Louise F. Moore, husband and wife, to obtain the refund of income taxes paid by them under protest after the assessment of deficiencies against them for the years 1957 through 1960. In their joint returns for those years, plaintiffs reported the income derived from the sale of 235 Polled Hereford cattle as capital gains on the basis

that the cattle had been held by them for breeding purposes and held for twelve months or more, as required by 26 U.S.C. § 1231(b) (3). The district director disallowed capital gains treatment as to 101 cows and a half interest in one bull. Plaintiffs paid an assessed deficiency, plus interest, in the amount of $42,-204.87. Claims for refunds were filed and denied, and this action was brought for that sum, plus interest from the date of payment. This cause is now before the court for disposition on the memorandum briefs of the parties, submitted after a trial to the court.

A procedural question must be resolved before consideration may be given to the merits. At the conclusion of the testimony of one of the plaintiffs, the government moved for partial judgment on the ground that a decision of the Tax Court, Moore v. Commissioner, 31 T.C. 735 (1959), a deficiency proceeding in which these same taxpayers were only partially successful, collaterally estopped plaintiffs in this action. The court reserved a ruling on the motion.

The Tax Court proceeding was concerned with deficiencies assessed for the years 1951 through 1953 with respect to capital gains treatment claimed by the taxpayers on sales of 206 animals. Such treatment had been disallowed as to 151 of the animals. The Tax Court analysed the taxpayers' method of operation at their Circle M Ranch and found that their principal occupation was raising breeding cattle for sale in the ordinary course of business, and that they maintained a top quality breeding herd primarily to supply brood animals for sale to other breeders in the ordinary course of business. The taxpayers' operation was viewed as being composed of three herds, a sale herd, a replacement herd and a breeding herd. As a result of the finding that their principal occupation was selling breeding animals, the Tax Court found that animals in the replacement herd were not held for breeding purposes, with the result that 81 of the animals were not entitled to capital gains treatment. However, on the basis of the

actual use of the remaining 70 animals, a breeding purpose was found and capital gains treatment was allowed.

In support of its motion for partial judgment, the government argues that the ultimate fact determined by the Tax Court in 1959 is identical to the ultimate fact which must be found here. That ultimate fact is defined as the cutoff point in the plaintiffs' method of operation, beyond which animals retained are considered to be held for breeding purposes and prior to which animals sold are considered to have been held for sale in the ordinary course of business.

■ This definition ignores the true nature of the ultimate facts to which the doctrine of collateral estoppel is confined. 30A Am.Jur. Judgments § 379. Ultimate facts are those which form material elements of the rights in controversy, and upon their combined occurrence the law raises the right or duty in question. The Evergreens v. Nunan, 141 F.2d 927, 152 A.L.R. 1187 (2d Cir. 1944) cert. denied 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579 (1944). Evidentiary facts or mediate data, on the other hand, are those from which the ultimate facts may be inferred. Ibid.

■ The material elements of a claim for capital gains treatment of the income from the sale or exchange of livestock under 26 U.S.C. § 1231(b) (3) are that the livestock on which the claim rests were held by the taxpayer for draft, breeding or dairy purposes and held for twelve months or more from the date of acquisition. It is the combined occurrence of these facts which raises the right of the taxpayer to capital gains treatment of the gain realized on the sale or exchange. The ultimate facts found by the Tax Court in Moore v. Commissioner, supra, were that all 151 animals *then in issue* had been held for twelve months or more; that 70 of those animals had been held for breeding purposes; and that 81 of those animals had been held for sale in the ordinary course of business. Upon the combined occurrence of these facts the law raised the

right of the taxpayers to have the income derived from the sale of 70 of the animals taxed as capital gains and the right of the government to have the income derived from the sale of 81 of the animals taxed as ordinary income.

The practice of the taxpayers in 1951 through 1953, i. e., the cutoff point in their system of cattle breeding which drew the line between sale and brood animals, was not an ultimate fact in that case nor would it be in this, although it may be mediate datum from which one ulitmate fact—the holding purpose—may be inferred. No fact decided in the first case, whether evidentiary or ultimate, is binding on this court unless that precise fact is, in the case here, an ultimate fact necessary to disposition. The Evergreens v. Nunan, supra; Yates v. United States, 354 U.S. 298, 338, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). Other than the length of the holding period, the ultimate facts here are the purposes for which the plaintiffs held the animals in this case before the time of their sale in the years 1957–1960. Regardless of when they were acquired or sold, the plaintiffs' purpose in holding *these* animals was not and could not have been decided by the Tax Court when it dealt with the purpose with which *other* animals were held before the time of their sale in the years 1951–1953. Since no tax consequences arising from the holding of the animals in this case were litigated in the Tax Court, such consequences may be judicially determined here.

No rational basis can be found for distinguishing the collateral estoppel issue in this case from the decision in Commissioner v. Sunnen, 333 U.S. 591, 68 S. Ct. 715, 92 L.Ed. 898 (1947), which included the following:

> Of course, where a question of fact essential to the judgment is actually litigated and determined in the first tax proceeding, the parties are bound by that determination in a subsequent proceeding even though the cause of action is different . . . . And if the very same facts and no others are involved in the second case, a case relating to a different tax year, the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change. But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus the second proceeding may involve an instrument or transaction identical with, but in form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue.
> . . . Before a party can invoke the collateral estoppel doctrine in these circumstances, the legal matter raised in the second proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment.

The purpose for which plaintiffs held the animals sold in the years 1957 to 1960 must be objectively determined from the circumstances. Whether those circumstances are identical or dissimilar to those upon which the Tax Court based its decision with respect to the taxpayers' purpose in holding other animals sold in earlier years, the purposes in holding the respective groups of animals in the different periods are separable and distinct. The legal matter raised in this second proceeding does not involve the same set of events that contributed to the rendering of the first judgment. See also Jackson v. King, 223 F.2d 714 (5th Cir. 1955). Accordingly, this court must hold that the doctrine of collateral estoppel is inapplicable in this case and that the defendant's motion for partial judgment must be overruled.

With respect to the merits of plaintiffs' claim, the court found at the conclusion of the trial that the bull involved here had been held for breeding purposes and had been held for the requisite period. The government's motion for partial judg-

ment did not apply to this animal and the court held that plaintiffs were entitled to the refund claimed with respect to this animal. Thus the remaining issues relate solely to the 101 cows and consideration may be limited to plaintiffs' treatment of their female animals.

■ The government does not deny that the 101 cows were all held for twelve months or more from the date of acquisition. The sole issue therefore is whether plaintiffs held those animals for breeding purposes. This is simply a question of fact, Biltmore Company v. United States, 228 F.2d 9 (4th Cir. 1955). Its resolution must be based upon all the facts and circumstances in this case, and, as in any civil matter, in order to prevail plaintiffs must sustain their burden of proof by a preponderance of the evidence. That evidence is largely uncontroverted here.

During the years in controversy, plaintiffs owned or leased approximately 5,100 acres of land near Senatobia, Mississippi. Approximately 2,400 acres of this land were devoted to the raising of crops, and 2,000 acres were utilized for the raising of Polled Hereford cattle. Farming and cattle raising have been plaintiffs' principal occupations since 1939. Over the years they developed a highly selective, line breeding program which resulted in one of the world's finest herds of Polled Hereford cattle.

This cattle operation encompassed two distinct and separate phases: 1) the development and maintenance of a prime breeding herd, and 2) the sale of cattle in the ordinary course of business. The cattle were divided into a breeding herd and a sale herd. Within each category, males and females were pastured separately. The animals in the sale herd were accessible to prospective buyers at all times, but those in the breeding herd were not subject to public inspection. Sales made from the sale herd were reported as ordinary income and are not in controversy here.

The rigid standards set by plaintiffs in their highly scientific line-breeding program, and the very concept of selective breeding, resulted in the elimination of animals from the breeding herd whenever it appeared that they would not contribute to, or would in fact impede, the achievement of the desired goal. When the weeding out process eliminated animals at birth or shortly afterwards, plaintiffs did not regard them as having been incorporated in the breeding herd but instead transferred them to the sale herd for sale in the ordinary course of business. However, eliminations which occurred at advanced stages in the growth of the animals, and their resulting sale, were treated by plaintiffs as transactions involving animals held for breeding purposes. Income from the sale of such animals was returned as long term capital gain.

There was a marked difference in the treatment of animals in the breeding herd and those in the sale herd, with respect to care, feeding, frequency and degree of inspection, manner of breeding, and other factors. Brood animals lived a cloistered life and followed a strict regimen, while sale animals were always open to public inspection and spent their time on the ranch in a much less disciplined, and less pampered, existence.

The calves produced by the breeding herd were born in a special calving pasture. At birth, all calves were inspected and analysed and those with obvious deficiencies which made then unsuitable for breeding purposes were transferred to the sale herd as soon as they could leave their mothers. The calves without apparent defects remained in the calving pasture until they were weaned, except for animals which, either because of illustrious ancestry or problems which required special treatment, were transferred to a nurse barn.

At weaning, which occurred at four to seven months of age, the calves in the breeding herd were again given a careful inspection and tested on the basis of bloodlines, physical appearance, family characteristics and the performance of ancestors. Those which passed these tests were adjudged fit for retention in the breeding herd and were transferred

to the weaned heifer pasture. Those which did not pass were transferred to the sale herd and sold in the ordinary course of business.

The calves remained in the weaned heifer pasture from the time of their arrival at four to seven months of age until they were twelve to fourteen months old, unless they were found in the interim to have developed disqualifying characteristics which had not been apparent at pre-weaning inspections. To this end, all animals in the weaned heifer pasture were given frequent inspections during that period. Animals which were found to be undesirable for breeding purposes were then transferred to the sale herd and sold in the ordinary course of business.

At twelve to fourteen months of age, calves in the weaned heifer pasture which had survived the weeding out process were transferred to the replacement heifer pasture. Sometime after their fifteenth month (a minimum age set by cattle registering associations) the animals in the replacement pasture were taken to bull paddocks and bred with the herd sires under carefully supervised conditions. They were then returned to the replacement pasture.[1]

The weeding out process is continual and does not stop upon classification of the animal as a mature cow. The same rigid standards which have prevailed from birth must still be met by the mature cows and later events may cause them to be eliminated from the breeding herd. In addition to such readily apparent causes as injury and disease, these later developments might include the finding that a cow was a "slow breeder," that it was unable to adequately nourish its offspring, or that previously unknown facts about its pedigree had come to light which indicated undesirability for breeding purposes. They might also include a judgment that certain cows possessed characteristics which, though not unde-

sirable in themselves, were unsuitable for concentrating and compounding in the breeding herd—a necessary consequence of the line breeding program.

In February of each year, including those years now in issue, plaintiffs held a public auction at which animals culled from the replacement heifer pasture and from the mature cow pasture were sold to the highest bidder. No animals from the sale herd were included in these auctions, nor were animals from the replacement and mature cow herds ever transferred to the sale herd. On rare occasions, such animals from the breeding herd were disposed of at "private treaty," or private sale, but the great majority of any such animals sold were offered at the annual auctions.

The brood animals to be sold at the auction were eliminated from the breeding herd upon a careful inspection made in the month before the auction. Plaintiffs regarded sales at "private treaty" or at the annual auction as sales of animals held for breeding purposes. The animals offered at the annual auctions were generally regarded as superior to to animals available for purchase from the sale herd, and the auctions, which were widely advertised, were normally attended by large crowds, sometimes numbering 2,500 persons or more.

The 101 cows now in issue were taken from either the replacement or mature cow herds and sold at either the annual auction or "private treaty." They ranged in age from nineteen months to fifty-four months, with by far the greatest number falling in the twenty to thirty month age group. All of the cows had been bred: 32 were bred once, 36 were bred twice, 22 were bred three times, six were bred four times, three were bred five times and two were bred six times. Two had dropped calves at the Circle M Ranch. Twenty-six of the cows were sold in 1957, 27 were sold in 1958 and 24 were sold in 1959. Eighteen of the cows were sold

1. Good animal husbandry requires that young unbred heifers, as well as most bred heifers which have not yet dropped their first calves, be kept physically separate from mature cows, for their own protection and proper development.

in 1960 and the income returned in that year as capital gains. In addition, the income from the sales of six cows in earlier years was received in 1960 and reported in that year. Two of the six were sold in 1952, two were sold in 1955, one was sold in 1958, and one was sold in 1959.

In holding that the taxpayers had not established that the animals in their 1951–1953 replacement herds were held for breeding purposes, the Tax Court, in Moore v. Commissioner, supra, found that their principal occupation was the raising of breeding cattle for sale to other breeders in the ordinary course of business. On this finding, the Tax Court distinguished McDonald v. Commissioner, 214 F.2d 341 (2d Cir. 1951), in which, on closely analogous facts, the taxpayer was allowed to treat the sale of young heifers as capital gains transactions.

The Tax Court viewed the 1951–1953 system as establishing three distinct herds at the Circle M Ranch—the sale herd, the replacement herd, and the breeding herd—and it laid heavy emphasis on the use of the term "replacement," which was interpreted as describing reserve animals not yet committed to the breeding herd.

■ Without questioning the correctness of the Tax Court findings, which, as noted above, were made on a separate record involving earlier tax years, this court is unable to make similar findings now. The record established here compels a finding that plaintiffs' primary purpose in maintaining and developing their superb breeding herd was to develop the perfect beef-producing animal. The testimony of M. P. Moore to this effect is uncontroverted and is indeed substantially corroborated by all the other evidence.[2] Although they profitably sold the brood animals culled from the breeding herd in the weeding out process, the evidence here would not support a finding that this business purpose was dominant and that their breeding herd was maintained primarily to insure a supply of quality breeding animals which could be profitably sold to other breeders in the ordinary course of business. The contrary result reached in the Tax Court persuaded that court that McDonald v. Commissioner, supra, was distinguishable. The result reached here persuades this court that the decision in this case should be not unlike the decision rendered in McDonald.

The division of the breeding herd into four sub-groups, unweaned calves, weaned heifers, replacement[3] heifers, and mature cows, has been described above. This division did not make a sub-group any less integrated into the breeding herd, however, and except for those calves culled at birth or shortly after because of obvious defects, animals retained in any sub-group of the breeding herd were held by plaintiffs because they expected that such animals had good potential for use as brood animals. Those which survived the initial weeding out at birth were unmistakably held with the hope that they would measure up to the high standards governing the line-breeding program. That program made it inevitable, of course, that substantial numbers of the brood animals would be culled each year, because of the occurrence of circumstances which rendered those animals unfit for breeding purposes. Until those circumstances occurred, however, the animals ultimately culled and sold were members of the breeding herd and were held for breeding purposes.

2. The government appears to have recognized in its brief that plaintiffs' primary occupation was the development of the breeding herd and not the production of breeding animals for sale in the ordinary course of business.

3. This court is not impressed by any connotations derived from the word "replacement." Note the language of Treasury Regulations, § 1.1231–2.(c). Example (5):

> However, those cattle held by the taxpayer as additions or *replacements* to his own breeding herd to produce calves are considered to be held for breeding purposes, even though they may not have actually produced calves. (Emphasis added.)

The fact that animals culled from the weaned heifers were transferred to the sale herd and sold in the ordinary course of business is not inconsistent with plaintiffs' contention that these animals were held for breeding purposes, since these animals were not old enough to have been held for twelve months or more from the date of acquisition.

The efficacy of plaintiffs' cattle judging techniques (which led to the development of what the government concedes to be one of the best Polled Hereford herds in the world) compels the inference that if an animal survived the rigorous testing of the pre-weaning stage and was transferred to the weaned heifer pasture, it was being retained because of its high potential for use as a brood animal, i. e., it was being held for breeding purposes. The 101 animals in this case had progressed even further. At approximately the same time that the holding period of animals in the weaned heifer pasture met the statutory minimum, their age dictated that they be transferred to the replacement heifer pasture. This step at the Circle M Ranch was the crossing of the nuptial threshhold, for within a short period the new members of the replacement herd would be bred to one of the herd sires. By entering this advanced group, after being subjected to more tests, the animals involved here were even more firmly entrenched as members of the breeding herd.

The government's argument on the merits is that "the evidence shows that a *final* determination of the quality of the animal may not be made until maturity, which is subsequent to normal calving age" (emphasis added), and therefore that these animals cannot be found to have been held for breeding purposes.[4] It should first be noted that the determination is never "final" until the animal is removed from the breeding herd by death or the weeding-out process. Each animal in the herd is always subject to the occurrence of the condition subse-

quent that it may be found unfit for breeding purposes.

Reading this contention as an argument that calving is the only permissible condition precedent to the mother's achievement of status as an animal held for breeding purpose, the defendant here fares no better than did the defendant in McDonald v. Commissioner, supra, where the same argument was rejected by the court with the following language:

We think, however, that this view penalizes breeders with skill sufficient to detect and cull inferior animals *even before they have been bred.* True, an affirmative judgment that an animal is superlative cannot be made without examination of its offspring. But the evidence is compelling that a negative judgment can often be made on the basis of such factors as . . . [here followed a list of physical characteristics indicative of the quality of the breed under consideration, Guernsey cattle]. Thus younger animals can be accurately culled, and the animals which the taxpayer sold were selected in this manner. Before an animal had been thus weeded out it was part of the regular herd, held for dairy and breeding purposes until it should prove unfit. (Emphasis added.)

The expertise of the plaintiffs in this field is fully recognized by the government and it cannot be doubted that they possessed "skill sufficient to detect and cull inferior animals even before they [had] been bred." Certainly, if the animals were retained *beyond* the time when they had been bred, plaintiffs would have an even better foundation for determining their breeding qualities. *Every animal here involved had been bred, most of them more than once, and two of them had actually dropped calves on the ranch.*

4. The government's brief does not discuss the apparent inconsistency of this position with its claim that none of the 101 animals, *even those which had dropped calves on the ranch,* were held for breeding purposes.

In summary, a clear preponderance of the evidence establishes that the primary purpose of the plaintiffs in raising brood animals was the development and maintenance of a top quality breeding herd, with the ultimate goal of developing a perfect beef-producing animal. The breeding herd, from which the 101 animals in controversy were drawn, was entirely separate from the sale herd. Animals in the breeding herd were held for breeding purposes if they were not culled at birth or shortly afterwards for obvious unfitness for breeding purposes. Having once attained status as an animal held for breeding purposes, the cattle were continuously held for that purpose until the occurrence of some subsequent event which caused plaintiffs to determine that they were unfit for further retention as brood animals. If such animals had been held for more than twelve months from the date of acquisition and were sold or exchanged within a reasonable time after they were culled, the income derived thereby was a capital gain. Each animal here involved met all of those requirements.

The government's sole argument that an animal cannot be found to be held for breeding purposes until it reaches maturity at normal calving age is shown to be untenable by the decision in McDonald v. Commissioner, supra, and by the applicable Treasury Regulations, § 1.1231.–2. (b) and (c), and the examples appended thereto. The substance of the cases and regulations in this regard is that an animal does not have to be mature, nor does it have to be used for the intended purpose, before it can be considered to be held for breeding purposes.

All of the 101 animals constituted property used in plaintiffs' trade or business within the meaning of 26 U.S.C. § 1231, and the income derived from their sale was capital gain. Plaintiffs are therefore entitled to a refund of the taxes and interest paid under the deficiency assessment, with interest from the date of payment.

The court intends that this memorandum shall constitute findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

An order will be entered in accordance with the foregoing.