**Robert L. NOWLAND and Mary C. Nowland.**

**The North Beach Amusement Company, Inc., Charles E. Nelson and Virginia M. Nelson, his wife, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 7369.**

United States Court of Appeals Fourth Circuit.

Argued March 14, 1957.

Decided May 15, 1957.

**451**

Eldridge Hood Young, Baltimore, Md., for petitioners.

Melvin L. Lebow, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., and Harry Baum, Atty., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before SOPER and SOBELOFF, Circuit Judges, and HUTCHESON, District Judge.

SOPER, Circuit Judge.

This case brings up for review the Tax Court's approval of determinations by the Commissioner of income tax deficiencies against the petitioning taxpayers for the years 1948 to 1950 inclusive. The taxpayers are Robert L. Nowland and Mary C. Nowland, his wife, Charles E. Nelson and Virginia M. Nelson, his wife, and the North Beach Amusement Company, Inc. The taxes in question were assessed upon (1) the income of a numbers game which was operated by the four individual taxpayers as partners under the name of Robert L. Nowland Associates during the taxable years, except for the last six months of 1950 when it was operated by the Nelsons alone; (2) the income of the North Beach Amusement Company, Inc., from an amusement park at North Beach, Calvert County, Maryland; and (3) the income from the operations of a farm for the breeding of horses by Charles Nelson at Ritchie, Maryland.

### The Associates

In 1944, the Nowlands and the Nelsons formed a partnership, known as Robert L. Nowland Associates, to take over a gambling enterprise or numbers game formerly operated by the Nelsons, and from October 1, 1947 to June 30, 1950, the four individuals were equal partners in the enterprise. The business required the services of writers or location men who accepted the money from the bettors and made out slips showing the amount of the bet and the number selected. Also employed were runners or pickup men who daily collected and

turned over the slips, but not the money, to the Associates. Clerks employed by the firm totaled the bet slips. Later in the day the "hit" or winning number was ascertained from race track mutuels and a "pay-off sheet" was prepared. Each runner was permitted to retain 30 percent of the daily bets which he reported and most of this commission was given to the writers as compensation. The remaining 70 percent was used to pay off the hits and the balance was turned in by the runner to the Associates on the following day. If the hits exceeded the 70 percent the excess was paid to the runner by the Associates.

Each runner was paid at the end of the month an additional commission of 25 percent of the excess of the 70 percent of the bets over the hits paid out during the month. If the hits exceeded 70 percent, the runner received no commission and the payment of the 25 percent commission was not resumed until the loss had been recouped in the following months out of the excess of Associates' share of the runner's bets over hits.

It was the practice of the partnership to destroy the bet slips and the pay-off sheets after they had been retained a short time. The winnings or losses on bets reported by the individual runners were recorded on a monthly form, but these records were destroyed prior to a trial of the partners for violating the gambling laws and were not available to government agents. The Associates, however, kept a ledger in which one sheet was used for each week's business and a separate line on each sheet for the daily operations. These sheets showed the total bets, the total hits, the 30 percent daily commissions, the 25 percent monthly commissions, and other expenses, such as salaries, stationery, etc. which were not itemized. For example, the ledger sheets for the year 1948 showed that the total bets were $1,903,151.85 and the total hits and commissions (at 30 percent) were $1,720,915.77, so that the total profits before expenses were $182,236.08 on which the runners' commission

of 25 percent would have been $45,559.02. The ledger sheets, however, showed that the 25 percent of gross profits paid to the runners was actually $49,969.97. Since the records were therefore not only incomplete but inconsistent, the Commissioner accepted the latter figure as a correct statement of the profits before expenses and made his calculation of net profits accordingly, and the Tax Court confirmed this conclusion.

█ The contention of the taxpayers is that this was incorrect because of testimony tending to show that from time to time runners left the employ of the firm in default and hence the figure which represented the commission of 25 percent paid to the runners was not an accurate basis for computing the gross profits of the business. There was however no specific evidence to sustain this contention. Three of the runners testified as witnesses but they were uncertain as to whether their accounts were in the red or in the black when they left the taxpayers' employ and the taxpayers were unable to give the names of the runners who left in default or the amounts of the defalcations. In these circumstances it cannot be said that the conclusion of the Tax Court in this matter was erroneous.

### Advertising

██ The taxpayers dispute the conclusion of the Tax Court that the Commissioner was justified in reducing the amount of the expenses designated as "advertising" on the ledgers for which the taxpayers claimed a deduction. This phase of the case concerns deductions claimed by all of the partners for the period ending July 1, 1950, and by the Nowlands for the last six months of that year. The items of expense on the ledger designated as "advertising" were made up of the cost of turkeys given at Christmastime to 15 or 20 office clerks and to an undetermined number of runners. In addition, annual cash bonuses of $50 were paid to each of the office clerks and to the runners. There was however no record of the persons or of the dates up-

on which the bonuses were paid. The entries merely showed "advertising" expenses which totaled from approximately $10,000 to approximately $11,000 for each of the taxable years. The Commissioner allowed 25 percent of these amounts as proper deductions and the Tax Court sustained this computation. It cannot be said that this conclusion was erroneous. The taxpayers had the burden of proving the amount of the deductible expenses since deductions are a matter of statutory privilege and must be shown by substantial evidence, which was lacking in this case. See Boehm v. Commissioner, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78; Miles-Conley Co. v. Commissioner, 4 Cir., 173 F.2d 958; Burka v. Commissioner, 4 Cir., 179 F.2d 483.

## Sale of Horses

Charles Nelson operated a farm principally for the raising of thoroughbred race horses. The horses were bred with this end in view and in order to improve the blooded stock in Maryland. Each year a sale of yearlings took place; and at the sale Nelson arranged for someone to bid in for him the horses he desired to retain. The taxpayers reported these transactions as sales of capital assets and computed the profit as capital gains in their income tax return. The Commissioner treated the proceeds of the sale as ordinary income, with the exception of the sale of one race horse for $10,000 in 1950 which he conceded to involve a long-term capital gain. The Tax Court sustained this determination, holding that the yearlings sold were property held primarily for sale in the ordinary course of trade or business. See § 117 (j) (1) of the Internal Revenue Code, as amended, 26 U.S.C. 1952 Ed., § 117.

The taxpayers take the position that all the horses were held as part of the breeding stock and hence were capital assets and that the annual sale of undesirable horses was merely incident to the maintenance of the high quality of the stock and not a transaction in the ordinary course of the business of raising horses for sale. The difficulty with the contention is that in each year, including the tax years in question, the taxpayers sold their entire crop of yearling horses which had never been raced and were too immature for breeding purposes. The sales were undertaken after the yearlings had been catalogued for buyer purposes and extensive advertising had been carried on in order to promote the sales. In these circumstances, the fact that the taxpayers bid in and retained some of the horses was a fact to be considered in determining the nature of the business, but it was not conclusive and there was substantial evidence to support the view that a main purpose of the business was to raise fine horses for sale.

In similar cases we have held that the profits of such a business are ordinary income and taxable as such. See Biltmore Co. v. United States, 4 Cir., 228 F.2d 9; Fox v. Commissioner, 4 Cir., 198 F.2d 719. This conclusion is not affected by the fact that in reporting the income in prior years as capital gains rather than ordinary income the taxpayers relied upon the advice of an Internal Revenue agent. A second agent subsequently advised the taxpayers differently; besides, each taxable year is a separate unit, and a ruling in one year is not binding as to another. See Commissioner v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898.

## Farm Expenses

The Nelsons had a garden plot on their farm estimated by one witness to be 100 by 150 feet in area and by another witness to be twice this size. On it they raised a large quantity of food for the family table and canned some of it for the winter. The garden was worked to some extent by Nelson and his wife and also by laborers employed on the farm. The taxpayers claimed as deductions for farm expenses amounts ranging from $70,000 to $107,000 annually during the tax years; but they made no attempt to segregate therefrom the cost of the materials used and the wages paid for the planting, raising and

caring for the garden. The Commissioner disallowed $1,000 each year for such expenses, estimating that this amount represented the cost of producing the food for the family. A deduction of this sort was proper since, under the terms of § 24(a) of the statute relating to deductions, 26 U.S.C. § 24(a) it is provided that no deduction shall in any case be allowed for personal living or family expenses. Therefore, the only question is whether there is substantial evidence to support the Commissioner's determination which the Tax Court approved. The burden was on the taxpayer of showing the right to the deductions, and since the farm expenses were charged in a lump sum it was incumbent upon the taxpayer to allocate the charges between the items properly deductible as business expenses and the items for which no allowance could be made. See Barnhill v. Commissioner, 4 Cir., 148 F. 2d 913, 917, 159 A.L.R. 1210. The taxpayers offered no evidence on this point but merely suggested that the wages of the gardeners could not have exceeded 75 cents an hour and that, therefore, the disallowance of $1,000 for a garden plot was excessive. While the matter is not free of doubt we do not feel justified in declaring that the finding of the Tax Court was clearly erroneous. Labor costs are substantial and doubtless the family establishment was conducted on a large scale, as indicated by the income of the taxpayers and the large amounts spent in maintaining the farm. In the absence of any testimony on the part of the taxpayers in respect to the matter, it is difficult to say that the sum disallowed was unreasonable or excessive in amount.

### Salaries of Officers of Corporation

Finally, the Commissioner's allowance for salaries of Mr. and Mrs. Nelson as officers of the North Beach Amusement Company must be considered. This company operated an amusement park in North Beach, Calvert County, Maryland, which included a sea food restaurant, dance hall, soda fountain, beach stand, bath house, bar, arcade, bingo game, hot dog stand, and various games. During 1949 and 1950, the years in question, Charles owned 166 of the $100 par value shares and his wife, his son and his daughter each held 50 shares of the total of 316 shares. Charles was president and Virginia secretary and treasurer during this period. Salaries paid to Charles and Virginia in 1940 amounted to $9,000 each. No compensation was paid to the officers for the years 1941 through 1946. A salary of $2,000 to each officer was paid in 1947 and a salary of $4,000 each in 1948. In 1949, Charles received $9,000 and Virginia $6,000. For the years 1950 and 1951 the payments authorized by the directors were $14,000 and $10,000, respectively. Total deductions for wages and salaries other than the compensation of officers ranged between approximately $33,000 in 1945 to approximately $47,000 in 1951.

No dividends were paid until 1947 when a 10 percent dividend was paid. In 1948, 1949 and 1951 a 20 percent dividend and in 1950 a 50 percent dividend was paid.

In the earlier years of the business, a general manager had been employed on a salary and bonus basis and after he left in 1946 or 1947 others were employed but were unsuccessful and the Nelsons were obliged to take over the task and they devoted much time and effort to it. The bar, the bingo game and the sea food house were run on concessions and the other operations had a manager or employee in charge. The activities of the two chief officers included the hiring of 150 employees, overseeing the operations, running the office, keeping the books and handling the money. Much time and supervision was required for the preparation of the park at the beginning of each summer season, and the taxpayers maintained an apartment at the beach which they used during the busy season. The season ran from May 30 to Labor Day.

The gross receipts of the entire operation ranged from approximately $158,000 in 1945 to $202,000 in 1951, and the net income before taxes ranged from approximately $1400 to approximately

$45,000 annually. The principal source of income during 1949 and 1950 was the proceeds from a number of slot machines which were purchased in 1948.

During the taxable period Charles was a member of two partnerships and the two Nelsons actively operated the numbers game after they took over the Associates.

The Commissioner determined that reasonable salaries for Virginia and Charles were $3,000 and $5,000, respectively, for the years 1949 and 1950; but the Tax Court raised these sums to $4,000 for Virginia and $6,500 for Charles in 1949, and $6,000 for Virginia and $10,000 for Charles in 1950. These allowances are to be contrasted with the salaries of $14,000 for Charles and $10,000 for Virginia paid for each of the years 1950 and 1951.

■■■■■ The issue as to the reasonableness of the salaries paid to the Nelsons by the corporation wholly owned by them was one of fact which the Commissioner was authorized to determine under the provisions of § 23(a) (1) (A) of the Code, 26 U.S.C. § 23(a) (1) (A), which provides for the deduction of all ordinary and necessary expenses paid in the carrying on of a trade or business, "including a reasonable allowance for salaries or other compensation for personal services actually rendered." The burden was on the taxpayers to show their right to the deduction claimed but the duty was imposed upon the Commissioner to examine its reasonableness and his finding is not open to review unless it is found by the court to be clearly wrong, Miller Mfg. Co. v. Commissioner, 4 Cir., 149 F.2d 421, 423; and where the officers to whom the salaries were paid were in complete control of the corporation's affairs, the situation calls for close scrutiny, Miles-Conley Co. v. Commissioner, 4 Cir., 173 F.2d 958, 960.

■■■■ In considering the reasonableness of allowances claimed, it is noticeable that in 1949, when the taxpayers took over the management of the operation, their combined salaries jumped from $8,000 to $15,000 and that in the following year the combined salaries were raised to $24,000. In the same period the aggregate raise in salaries of all the other executive personnel was merely $3,011.20. It should be borne in mind also that most of the activities ran only part of the year, from May 30 to Labor Day, and that throughout the year the taxpayers were deeply involved in other pursuits including the farm in Maryland, which was a large enterprise, and the numbers business, which involved the handling of considerable personnel and large sums of money. Moreover, there is no reasonable explanation for the increase of the combined salaries from $8,000 in 1948 to $24,000 in 1950 and 1951. The explanation is not found in the increased returns from the business since the net income for the years 1948 to 1951 inclusive was, respectively, $46,338.72, $30,026.76, $41,444.57 and $44,953.09. The record does not contain any evidence as to the salaries paid for like services in other enterprises under similar circumstances and we are unable to say that the conclusions of the Tax Court were erroneous.

Affirmed.