ROYAL CROWN BOTTLING COMPANY OF WINCHESTER, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WILLIAM E. BRIDGEFORTH, JR. and RUTH D. BRIDGEFORTH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Royal Crown Bottling Co. v. Commissioner
Docket Nos. 9977-80, 9978-80.
United States Tax Court
T.C. Memo 1983-611; 1983 Tax Ct. Memo LEXIS 169; 46 T.C.M. (CCH) 1570; T.C.M. (RIA) 83611; September 28, 1983. *169 Lewis M. Costello, for the petitioners. T. Keith Fogg, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in corporate income tax of petitioner Royal Crown Bottling Company of Winchester, Inc., for its fiscal years ended May 31, 1975, May 31, 1976, and May 31, 1977, in the amounts of $41,219.11, $127,557.28 and $77,359.77, respectively. By amendment to answer, respondent claimed increased deficiencies of $9,600, $4,800 and $9,600 for these respective years, making the total deficiencies in controversy $50,819.11, $132,357.28 and $86,959.77 for the fiscal years ended May 31, 1975, 1976 and 1977, respectively. Respondent determined deficiencies in income tax of petitioners William E. Bridgeforth, Jr., and Ruth D. Bridgeforth for the calendar years 1975, 1976 and 1977 in the amounts of $9,936.48, $35,266 and $26,552.37, respectively. By amendment to answer, respondent claimed increased deficiencies of $1,443.75 and $2,189.87 for the fiscal years ended May 31, 1975 and 1977, respectively, making the total deficiencies in controversy for these respective years $11,380.23 and $28,742.24. Some of the issues raised by the *170 pleadings have been disposed of by agreement of the parties, leaving for decision whether payments made by petitioner Royal Crown Bottling Company of Winchester, Inc., to petitioner William E. Bridgeforth, Jr., its president, under a compensation arrangement providing him with a fixed salary and a yearly bonus based on a percentage of corporate profits, represented reasonable compensation for his services or represented in part distributions of dividends under section 301. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner Royal Crown Bottling Company of Winchester, Inc. (Royal Crown of Winchester), is a corporation duly incorporated under the laws of the State of Virginia. Royal Crown of Winchester, at the time of the filing of its petition herein, maintained its principal place of business in Winchester, Virginia. Royal Crown of Winchester filed U.S. Corporation income tax returns for its fiscal years ended May 31, 1975, May 31, 1976, and May 31, 1977, with the Internal Revenue Service *171 Center, Memphis, Tennessee. Petitioners William E. Bridgeforth, Jr., and Ruth D. Bridgeforth, husband and wife, resided in Winchester, Virginia, at the time of the filing of their petition herein. Mr. and Mrs. Bridgeforth filed joint individual income tax returns for the calendar years 1975, 1976 and 1977 with the Internal Revenue Service Center, Memphis, Tennessee. Royal Crown of Winchester is the successor to a bottling operation business begun in 1933 in Winchester, Virginia, by William E. Bridgeforth, Sr. (Mr. Bridgeforth, Sr.), the father of petitioner William E. Bridgeforth, Jr. (Mr. Bridgeforth). Prior to moving to Winchester, Mr. Bridgeforth, Sr., had been employed as a route driver, then later was a partner, in a bottling operation conducted in Culpeper, Virginia. After moving to Winchester in 1932, Mr. Bridgeforth, Sr., acquired a local bottling business. For a number of years his business was essentially a local, one-man operation. Gradually, however, over the years he began to hire additional persons as employees and by 1956 he employed approximately 15 full-time employees in his business. Mr. Bridgeforth, Sr., conducted this business as a sole proprietorship. Mr. *172 Bridgeforth was born on February 26, 1931, shortly before his father moved his family to Winchester. Beginning in high school, Mr. Bridgeforth worked in his father's bottling business on a part-time basis on school days and also on weekends, holidays and during summers. Following his graduation from high school, Mr. Bridgeforth worked for his father for approximately 14 months as a driver-salesman prior to his entering the University of Miami in September 1950. Mr. Bridgeforth successfully completed his college education in June of 1954 and received a bachelor's degree in business administration. Shortly after his graduation from college, Mr. Bridgeforth, as a result of his participation in the ROTC program while at college, was commissioned as a second lieutenant in the United States Army. Mr. Bridgeforth, after completing his military service, returned to work for his father in the latter part of 1956. Mr. Bridgeforth was initially given the position of assistant manager. After his father observed his performance in the position for 60 days, Mr. Bridgeforth's responsibilities were increased to include those of sales manager. As sales manager, Mr. Bridgeforth directly supervised *173 all sales made in his father's business, and in this position he also organized a training program for the company's sales personnel. Gradually, Mr. Bridgeforth, Sr., transferred more and more of the management functions of his business to Mr. Bridgeforth. In 1960, Mr. Bridgeforth assumed the duties of production manager at the bottling plant and in this capacity began to hire and replace the employees at the plant. In 1965, Mr. Bridgeforth, Sr., incorporated his bottling business. Mr. Bridgeforth, Sr., transferred all of the operating assets of his sole proprietorship to Royal Crown of Winchester except for the real estate, which he leased to the newly formed corporation. The assets transferred to the corporation consisted of a bottling line, cash, accounts receivable, inventories, prepaid expenses and deposits, trucks, automobiles, furniture and fixtures. These transferred assets had a total value of $243,825, but were subject to liabilities of $189,825. The $54,000 net value of the assets transferred together with initial cash of $1,000 comprised the corporation's capital at incorporation of $55,000. Mr. Bridgeforth, Sr., was issued all 550 shares of Royal Crown of Winchester's *174 outstanding stock. Up until the time of the incorporation of Royal Crown of Winchester, Mr. Bridgeforth, Sr., had taken an active role in his business. However, he already had begun to experience health problems. Upon the incorporation of Royal Crown of Winchester, Mr. Bridgeforth, Sr., Margaret W. Bridgeforth (Mr. Bridgeforth, Sr.'s wife) and Mr. Bridgeforth were elected as the directors of the corporation. Mr. Bridgeforth was named as the president of the corporation; Mr. Bridgeforth, Sr., was its secretary-treasurer; and Mr. Bridgeforth, Sr.'s wife Margaret was its vice-president. These three individuals continued to occupy these same positions as officers and directors of Royal Crown of Winchester until the death of Mr. Bridgeforth, Sr., in 1979. Mr. Bridgeforth, Sr.'s wife at no time has taken an active role in the conduct of the corporation's business. She has not received a salary nor been a stockholder. She has not participated in the management of the corporation's business, other than by giving her approval as a director to management decisions made by her husband and son. Royal Crown of Winchester continued to carry on the same business which Mr. Bridgeforth, Sr., *175 engaged in as a sole proprietor. These activities of Royal Crown of Winchester consisted of its manufacture and distribution at wholesale and at retail of nonalcoholic beverages. The corporation continued to operate under the Royal Crown Cola franchise which Mr. Bridgeforth, Sr., had obtained previously. Under this franchise, the corporation produced and marketed Royal Crown Cola and the other Nehi products of the Royal Crown Cola Company. Additionally, the corporation continued to carry on a substantial coin operated vending machine business. In addition to the Royal Crown Cola franchise, the corporation operated a Mountain Dew franchise which Mr. Bridgeforth, Sr., had received in 1964. After its formation in 1965, Royal Crown of Winchester continued to operate under this franchise. Besides the Royal Crown Cola and Mountain Dew franchises, the corporation subsequently obtained other soft drink franchises. In 1968, it obtained a Canada Dry franchise; in 1969, it obtained a Dr. Pepper franchise; in 1974, it obtained a Sugar Free Dr. Pepper franchise and at such time also obtained Dr. Pepper franchise rights to new territory; and in 1975, it obtained a Frostie franchise. Additionally, *176 subsequent to the years here in issue, the corporation has obtained a Lipton Tea franchise and a Perrier bottled water franchise. From the date of the corporation's acquisition of the Dr. Pepper franchise in 1969, Mr. Bridgeforth has made all decisions involving the corporation's acquisition of additional franchises. In 1968, Mr. Bridgeforth handled the renegotiation of the corporation's Royal Crown franchise and also handled the negotiations in 1974 concerning the expansion of the franchise to include other territories. In 1967, it was decided to move the corporation to new business premises in Winchester. A new facility which would allow the corporation to expand its operations was to be constructed at the new location. From the date the decision to move was made, Mr. Bridgeforth was responsible for working with a contractor on the design and layout of the corporation's new facility. This new facility covered approximately 70,000 square feet. After completion of the construction, Mr. Bridgeforth supervised the moving of the corporation's existing bottling line to the new facility in late 1968. In addition, while Mr. Bridgeforth, Sr., had supplied the credit and owned the premises, *177 it was Mr. Bridgeforth who arranged the necessary financial details. Some time in 1968, Mr. Bridgeforth decided to have the corporation move into the production of canned soft drinks. Mr. Bridgeforth negotiated the purchase of a canning line. He also handled the construction of a 15,000 square foot addition to the bottling plant to house the canning line. The canning line was installed by the corporation's employees under the supervision of Mr. Bridgeforth, who personally handled the laying out of the line in an effort to obtain maximum efficiency. In 1971, Mr. Bridgeforth decided that the corporation should increase its production capabilities by purchasing certain additional high-speed, specialized equipment. The acquisition of such equipment necessitated the construction of a further 15,000 square foot addition to the corporation's plant. The decision to expand the plant and purchase the new equipment was subject to the approval of Mr. Bridgeforth, Sr., since $230,000 had to be borrowed to make these proposed capital improvements. However, Mr. Bridgeforth had conceived the idea of making these improvements and solely carried out their implementation upon receiving his father's *178 approval. Besides working with the contractor on the design and layout of the addition to the plant building, Mr. Bridgeforth later supervised the location and installation of the new equipment. Mr. Bridgeforth, in 1971, also decided to have the corporation acquire a trucking capacity. The addition of this trucking capacity significantly changed the production of the corporation by allowing the corporation to haul cans out to other dealers and haul empty containers back in. This trucking capacity was also later expanded to include the trucking of liquid sugar to be used as a sweetener in the beverages being produced. In 1977 and 1978, pursuant to a decision made solely by Mr. Bridgeforth, the corporation at a cost of approximately $1 million totally upgraded its bottling operations. A new can line and a new bottling line were acquired and installed. As a result of the installation of the new can line, the corporation's production capacity of 12 oz. cans was increased from 220 cans per minute to 800 cans per minute. The installation of the new bottling line increased the corporation's production capacity of 10 oz. bottles from 110 bottles to 300 bottles per minute and increased *179 the corporation's production capacity of 16 oz. bottles from 60 bottles to 150 bottles per minute. Mr. Bridgeforth selected the equipment and supervised the installation and laying out of the two new lines.
Mr. Bridgeforth made all management decisions regarding the corporation's vending machines, bottles and inventory. Mr. Bridgeforth was directly responsible for the corporation's purchases of sugar, the major ingredient in the soft drinks produced. Mr. Bridgeforth directly handled all purchases of sugar contracts by the corporation on the commodities market and its dealings in futures contracts and closures of such contracts. Mr. Bridgeforth further was directly responsible for the corporation's purchases of petroleum products, containers, trucks, tractors, trailers and other acquisitions. During the years in issue, the duties performed by Mr. Bridgeforth in his employment with Royal Crown of Winchester included the following: (1) acting as general production supervisor in the plant; (2) conducting research and development into new products which might be marketed or licensed by the corporation; (3) responsibility for the management of the sales made by the corporation; (4) the *180 handling of all personnel decisions involving the hiring and firing of all persons employed by the corporation; (5) supervision of all purchasing done by the corporation, including its sugar purchases, its purchases of glass and cans for its inventories, its purchases of vending equipment, as well as its purchases of energy products, vehicles, and accessories; (6) responsibility for all capital improvements made by the corporation with regard to production, plant equipment, vending machines and other aspects of its business; (7) responsibility for the finances of the corporation, which included the maintenance of the corporation's daily cash flow, temporary investments, extensions of credit to its customers, the obtaining of credit for the corporation and long-term planning concerning the corporation's making of capital improvements; and (8) performance of general management duties such as the settlement of claims by customers of the corporation for damaged or defective merchandise, the determination of when and to what extent price increases for the corporation's products would be effective, the making of alternative arrangements for the production of certain products when necessitated *181 by production and plant changes, the handling of employee and production crises, and the conducting of a daily truck check-in of the routemen employed by the corporation. During the years indicated, Royal Crown of Winchester yearly employed the following number of individuals in the following categories: Truck and
Vending
Routemen
Direct Production
Plant
Automobile
Machine
and
Year
Line Personnel
Custodians
Mechanics
Repairmen
Drivers [1]
1970
43
3
2
2
19
1971
54
3
2
2
16
1972
81
4
2
3
16
1973
75
3
2
3
19
1974
50
3
2
3
17
1975
46
3
2
3
17
1976
43
3
2
3
17
1977
45
3
1
4
18
Total Employees
Year
Supervisors [2] *182 Personnel [3]
Managers [4]
During Year
1970
2
3
2
76
1971
3
5
2
87
1972
3
4
2
115
1973
4
4
2
112
1974
4
4
2
85
1975
4
4
2
81
1976
4
4
2
78
1977
5
4
2
82 The total number of employees during the years indicated above includes part-time and seasonal employees who worked at any time during a calendar year, as well as full-time employees. In each year there were generally only five to six summer employees. Additionally, in each of the calendar years above the maximum number of employees for any one pay period did not exceed 60. Of the different job categories, fluctuation in the number of employees occurred mostly in direct production line personnel. During the years in issue, Royal Crown of Winchester directly distributed its soft drink products in seven Virginia counties and four West Virginia counties. However, a sizable percentage of the corporation's soft drinks was produced under contract arrangements with other bottlers and distributors. These other bottlers and distributors distributed the soft drink products of Royal Crown of Winchester in the following additional *183 localities: Virginia
Springfield, Richmond, Staunton,
Bluefield, Culpeper and Pulaski
West Virginia
Richwood, Elkins, Fairmont and
Parkersburg
Pennsylvania
Scranton, Washington, Wiliamsport,
York, Altoona, Bedford, Shippenville
and Uniontown
Maryland
Corriganville
New York
Buffalo Mr. Bridgeforth devoted his attention primarily to Royal Crown of Winchester during the years in issue. Mr. Bridgeforth's standard work week during this time was 50 to 60 hours, although 60- to 70-hour work weeks were put in by him with some frequency during this time. Mr. Bridgeforth devoted approximately 10 percent of his time at work to matters relating to the Royal Crown Bottling Company of Hagerstown, Inc. Mr. Bridgeforth, during the years in issue, was the president of that corporation and also owned 97 percent of its stock. Royal Crown of Winchester sold its soft drink products to Royal Crown of Hagerstown, which in turn marketed the products. Royal Crown of Hagerstown's operation was basically a warehousing operation. The business premises of Royal Crown of Hagerstown were located approximately 40 miles away from the business premises of Royal Crown of Winchester. Mr. Bridgeforth's attention to this enterprise *184 consisted mainly of reviewing reports on a daily basis and doing problem solving when necessary either by phone or by making a visit. Mr. Bridgeforth, during the years in issue, did not take any extended vacations, although he did take occasional short pleasure or recreational trips on weekends in order to relax. He was not an active member of any civic club, nor did he hold any positions as an officer or director of any charities. Mr. Bridgeforth, during the years in issue, did serve as a director of the Bank of Frederick County, but has since resigned. Mr. Bridgeforth's energies were primarily directed to the welfare of the corporation's soft drink bottling business. Mr. Bridgeforth, Sr., the other employee of Royal Crown of Winchester in the management category, had a work day which typically consisted of his picking up the mail, reviewing it and dictating a letter or two, then reading the Wall Street Journal and participating in any management discussions initiated by Mr. Bridgeforth. Mr. Bridgeforth, Sr., would normally leave the corporation's offices around 11:30 a.m. to make a bank deposit and he would be gone for the afternoon. However, on occasion, when he felt well *185 he would return around 4:00 p.m. to help Mr. Bridgeforth check in the routemen and he would then leave immediately thereafter, usually at 5:00 or 5:30 p.m. Previous to the incorporation of Royal Crown of Winchester, when Mr. Bridgeforth had been employed by his father, Mr. Bridgeforth and his father had an agreement that he would be paid a bonus equal to 25 percent of the business's income, prior to reduction for any bonuses and income taxes, for the fiscal years ending March 31, 1957, March 31, 1958, and March 31, 1959. This arrangement remained in effect during the five succeeding fiscal years; however, because of reduced business income and the greater personal needs of Mr. Bridgeforth, his father paid him additional flat amounts during these same fiscal years from 1960 through 1964. After incorporation of Royal Crown of Winchester, the bonus arrangement for Mr. Bridgeforth was initially continued at 25 percent of the corporation's income before bonus and income taxes, but was soon modified to 25 percent of the corporation's income prior to any reduction for bonuses, income taxes, Mr. Bridgeforth, Sr.'s salary, and rents on the old plant. This arrangement was not formally adopted *186 in a resolution by the board of directors of Royal Crown of Winchester. However, this arrangement constituted the method by which the bonuses paid to Mr. Bridgeforth were computed in each of the corporation's fiscal years, except for its fiscal year ended May 31, 1971. In such year, notwithstanding a lesser computation, the corporation declared a $50,000 bonus as additional compensation to Mr. Bridgeforth. At the time the corporation declared this $50,000 bonus to Mr. Bridgeforth on May 28, 1971, Mr. Bridgeforth had been employed for a combined total of 15 years by the corporation and by his father prior to the formation of the corporation. For the first 14 of these years, Mr. Bridgeforth had been paid yearly amounts of compensation which ranged from a low of $6,490 for the fiscal year ended May 31, 1963, to a high of $30,760 for the fiscal year ended May 31, 1967. In such 14-year period, the yearly compensation paid to Mr. Bridgeforth averaged $17,299.77. The addition of the $50,000 bonus declared by the corporation in its fiscal year ended May 31, 1971, increased the average yearly compensation received by Mr. Bridgeforth over these 15 years to $19,111.13. Pursuant to the advice *187 of the corporation's certified public accountant and its attorney, the bonus arrangement for Mr. Bridgeforth was formalized in a February 10, 1972, corporate resolution adopted by the directors of the corporation. The minutes of such meeting of the directors of the corporation, in pertinent part, are as follows: RESOLVED, that the salary for W. E. Bridgeforth, Jr., effective January 1, 1972, be and the same hereby is declared to be $750.00 per week for a total of $39,000.00 per annum. FURTHER RESOLVED, that W. E. Bridgeforth, Jr., shall hereafter participate in the profits of the corporation computed before taxes, or year-end bonuses, or any employee pension or profit-sharing agreements, as follows: first $15,000.00 of profits of the extent of ten percent (10%) thereof; next $15,000.00 of profits to the extent of twenty-five percent (25%) thereof; profits over $30,000.00 to the extent of thirty-three and one-third percent (33 1/3%) thereof. The corporation never had a plan of deferred compensation for any of its employees. The corporation does provide its employees with medical benefits through a group health insurance plan. No bonuses of any material amounts were paid by the corporation *188 to any of its employees other than Mr. Bridgeforth and Mr. Bridgeforth, Sr., during the years in issue. The following table sets forth the salary and bonus paid to Mr. Bridgeforth by his father and later by the corporation in the years covering the period from April 1, 1956 through May 31, 1977: W. E. Bridgeforth, Jr.
Sole Proprietorship
Year Ended
Salary
Bonus
Total
3/31/57 (part year)
$3,400.00
$3,859.76 a
$7,259.76
3/31/58
5,200.00
4,242.41 a
9,442.41
3/31/59
5,264.00
6,504.82 a
11,768.82
3/31/60
6,461.00
4,000.00 b
10,461.00
3/31/61
6,525.00
6,000.00 b
12,525.00
3/31/62
6,510.00
6,000.00 b
12,510.00
3/31/63
6,490.00
6,490.00
3/31/64
10,745.38
6,000.00 b
16,745.38
12/31/64
5,929.62
16,000.00 b
21,929.62
Corporation
Year Ended
Salary
Bonus
Total
5/31/65 (part year)
$3,675.00
$4,300.00 a
$7,975.00
5/31/66
9,265.00
11,200.00 c
20,465.00
5/31/67
9,160.00
21,600.00 c
30,760.00
5/31/68
9,195.00
6,650.00 c
15,845.00
5/31/69
9,125.00
6,250.00 c
15,375.00
5/31/70
11,345.00
14,000.00 c
25,345.00
5/31/71
11,770.00
50,000.00 b
61,770.00
5/31/72
31,890.00
2,150.98 d
34,040.98
5/31/73
39,200.00
32,589.25 d
71,789.25
5/31/74
39,200.00
86,971.13 d
126,171.13
5/31/75
39,050.00
143,529.48 d
182,579.48
5/31/76
39,200.00
333,203.33 d
372,403.33
5/31/77
39,175.00
242,374.30 d
281,549.30
*189 At the incorporation of Royal Crown of Winchester, Mr. Bridgeforth, Sr., had been issued all 550 of its outstanding shares. The number of the corporation's outstanding shares has since remained at 550 up through the date of the trial in the instant case. Mr. Bridgeforth, Sr., on various dates had made gifts of some of his shares in the corporation to Mr. Bridgeforth. On December 28, 1966, Mr. Bridgeforth received as a gift 150 shares in the corporation. On December 30, 1967, he received a further 50 shares in the corporation from his father, and on February 28, 1969, he received another 50 shares in the corporation from his *190 father. On December 1, 1976, Mr. Bridgeforth received another 100 shares in the corporation from his father. Mr. Bridgeforth, Sr., died on July 4, 1979, and by bequest left his remaining 200 shares in the corporation to Mr. Bridgeforth. Mr. Bridgeforth, Sr., had another son who was 5 years younger than Mr. Bridgeforth. This younger son had also at various times assisted in Mr. Bridgeforth, Sr.'s business. The younger son, after working a short time for his father and after a brief musical career, operated a car dealership for his father in Winchester in 1964. The dealership was owned by a corporation in which Mr. Bridgeforth, Sr., held all of the stock. This business venture in which Mr. Bridgeforth, Sr., established his son proved to be unsuccessful, with the result that Mr. Bridgeforth, Sr., lost in excess of $60,000. The younger son was then allowed to enter into the family bottling business. However, as a result of this son's failures at various later business ventures, Mr. Bridgeforth, Sr., came not to trust his young son's business judgment and excluded him from all participation in decision making in the bottling business. Mr. Bridgeforth, Sr., further provided in *191 his will that his younger son would not have any interest in the corporation by leaving all of his shares to Mr. Bridgeforth. Mr. Bridgeforth knew of his father's decisions to exclude his brother from the bottling business and to not give him any share in its ownership. The corporation had the following gross sales, income and capital stock and retained earnings in fiscal years covering the period from June 1, 1964 to May 31, 1977: Income
Fiscal
(Loss) Before
Income
Capital Stock
Year
Gross
Fed. & State
Taxes or
& Retained
Ended
Sales
Income Taxes
(Refunds)
Earnings
5/31/65 * *192 $284,184.42
$12,910.03 $3,023.65 $64,886.38
5/31/66
811,772.89
4,516.20 258.26 69,144.32
5/31/67
857,616.41
36,942.39 11,822.14 94,264.57
5/31/68
877,787.25
(6,733.89)
(2,919.31)
96,324.59
5/31/69
1,197,575.16
(5,270.09)
(9,440.97)
100,495.47
5/31/70
1,414,520.47
17,486.65 4,674.54 113,307.58
5/31/71
1,555,807.26
36,185.51 11,554.54 137,938.55
5/31/72
1,942,364.72
15,452.94 (3,395.03)
156,786.52
5/31/73
3,351,311.79
73,428.49 23,449.03 206,765.98
5/31/74
4,717,421.53
178,192.25 81,451.14 303,507.09
5/31/75
6,303,108.51
281,308.95 127,015.60 457,800.44
5/31/76
7,208,537.82
660,656.68 307,452.74 811,004.38
5/31/77
7,379,459.30
478,998.61 221,692.04 1,068,310.95
The following table compares the compensation paid to Mr. Bridgeforth, as well as the total compensation paid to all employees of the corporation, to the sales made by Royal Crown of Winchester in each of its fiscal years covering the period from January 5, 1964 to May 31, 1977: Total Compen-
Total Compen-
Fiscal
Compensation
Compensation
as
sation Paid
sation as
Year
Paid to Mr.
Percentage of
to all
percentage
Ended
Sales
Bridgeforth
Sales
Employees
of Sales
5/31/65
$284,185
$7,975
2.81
$73,849
25.99
5/31/66
811,772
20,465
2.52
226,568
27.91
5/31/67
857,616
30,760
3.59
251,874
29.37
5/31/68
877,787
15,845
1.81
233,313
26.58
5/31/69
1,197,575
15,375
1.28
266,385
22.24
5/31/70
1,414,520
25,345
1.79
303,330
21.44
5/31/71
1,555,807
61,770
3.79
367,172
23.60
5/31/72
1,942,364
34,040
1.75
384,849
19.81
5/31/73
3,351,311
71,789
2.14
469,282
14.00
5/31/74
4,717,421
126,171
2.67
610,434
12.94
5/31/75
6,303,108
182,579
2.90
788,149
12.50
5/31/76
7,208,537
372,403
5.17
1,061,405
14.72
5/31/77
7,379,459
281,549
3.82
1,011,853
13.71 The major factor behind the large increase in sales by the corporation beginning in its 1974 fiscal year was the rapid rise in sugar prices which took place *193 in 1974. In 1974, the price of sugar went from about 9 cents a pound to over 60 cents a pound. The increased cost of this basic ingredient of many soft drinks resulted in increased wholesale and retail prices for soft drinks. In 1975, there was a steep drop in sugar prices to about 14 cents a pound. This was followed by further smaller declines in prices in 1976 and 1977, so that by 1977 sugar prices had again reached the same price levels existing before the rapid increase in 1974. However, there was no concomitant decline in either wholesale or retail soft drink prices. Since the public had largely accepted the increased retail prices for soft drinks, bottlers, distributors and retailers continued to charge the same prices. Another result of the 1974 increase in sugar prices was that many bottlers were forced out of business. Thus, in 1975, 1976 and 1977 those bottlers still in business had less competition. Royal Crown of Winchester since the time of its incorporation through the end of the period here in issue had the following capital structure: Fiscal
Year
Capital
Retained
Total
Ended
Stock
Earnings
Capital
5/31/65
$55,000
$9,886
$64,886
5/31/66
55,000
14,144
69,144
5/31/67
55,000
39,265
94,265
5/31/68
55,000
41,325
96,325
5/31/69
55,000
45,495
100,495
5/31/70
55,000
58,308
113,308
5/31/71
55,000
82,939
137,939
5/31/72
55,000
101,787
156,787
5/31/73
55,000
151,766
206,766
5/31/74
55,000
248,507
303,507
5/31/75
55,000
402,800
457,800
5/31/76
55,000
756,004
811,004
5/31/77
55,000
1,013,311
1,068,311
The *194 following table compares the yearly after-tax profits to the total capital of the corporation's for each of its fiscal years covering the period from the time of its incorporation to the end of the period here in issue: Income (Loss)
After Tax Profits
Fiscal
Before Fed.
After Tax
(Loss) Expressed
Year
Total
& State Income
Profits
as Percentage on
Ended
Capital
Taxes
(Loss)
Total Capital
5/31/65
(5 mos)
$64,886
$12,910 $9,886 15.23 5/31/66
69,144
4,516 4,257 6.15 5/31/67
94,264
36,942 25,120 26.65 5/31/68
96,324
(6,733)
(3,814)
(3.96)
5/31/69
100,495
(5,270)
4,170 4.15 5/31/70
113,307
17,486 12,812 11.31 5/31/71
137,938
36,186 24,630 17.85 5/31/72
156,786
15,452 18,847 12.02 5/31/73
206,765
73,428 49,979 24.17 5/31/74
303,507
178,192 96,741 31.87 5/31/75
457,800
281,308 154,293 33.70 5/31/76
811,004
606,656 353,203 43.55 5/31/77
1,068,310
478,998 257,306 24.08  For the 1975, 1976 and 1977 fiscal years, Mr. Bridgeforth's bonus was computed based on the corporation's having income, before taxes and prior to the payment of bonuses but after reduction for a $39,000 salary to Mr. Bridgeforth, in the amounts of $444,838.44, $1,013,859.99 and $741,372.90, respectively. During the period from the time of its incorporation through the end *195 of the last of its fiscal years here in issue, Royal Crown of Winchester paid no dividends to its shareholders. Royal Crown of Winchester on its income tax return for its fiscal year ending May 31, 1975, took a $182,579.48 deduction for the compensation it paid to Mr. Bridgeforth in such year. Of such amount, $39,050 was for the salary it paid to Mr. Bridgeforth and the balance was for a bonus computed under the arrangement adopted in the February 10, 1972, resolution by the corporation's directors. Royal Crown of Winchester on its income tax return for its fiscal year May 31, 1976, took a $372,403.33 deduction for the compensation it paid to Mr. Bridgeforth. Of such amount, $39,200 represented the salary it paid to Mr. Bridgeforth and the balance represented his yearend bonus. Royal Crown of Winchester on its income tax return for its fiscal year ended May 31, 1977, took a $281,549.30 deduction for the compensation it paid to Mr. Bridgeforth. Of this amount, $39,175 represented the salary paid to Mr. Bridgeforth and the balance represented his yearend bonus. Mr. and Mrs. Bridgeforth on their income tax returns for the calendar years 1975, 1976 and 1977 reported in income his *196 receipt of $188,392, $379,228 and $293,399 of compensation, respectively. On each of the returns, these reported amounts of compensation were stated to be earned income subject to a maximum tax computation. Respondent in his notice of deficiency to Royal Crown of Winchester disallowed portions of the amounts deducted as compensation paid to Mr. Bridgeforth with the following explanation: a) Officer Salary
5-31-75
$82,579.48
5-31-76
262,403.33
5-31-77
161,549.30
The deduction for compensation paid to Mr. W. E. Bridgeforth, Jr., during the taxable years ending 5/31/75, 5/31/76 and 5/31/77 must be reduced by the amounts listed below. These are the amounts which exceed a reasonable allowance for salaries or other compensation for personal services rendered within the meaning of Section 162 of the Internal Revenue Code. The following tabulation shows the amount claimed, allowed and disallowed as compensation: 5-31-75
5-31-76
5-31-77
Amount Claimed
$182,579,48
$372,403.33
$281,549.30
Amount Allowed
100,000.00
110,000.00
120,000.00
Amount Disallowed
$ 82,579,48
$262,403.33
$161,549.30
In his amendment to answer, respondent alleges that a proper reasonable salary for Mr. Bridgeforth is $80,000 for the fiscal *197 year 1975 and $100,000 for each of the fiscal years 1976 and 1977. Respondent in his notice of deficiency to Mr. and Mrs. Bridgeforth gave the following explanation: a) Salary Decreased for years 1975, 1976 and 1977. b) Dividends increased for years 1975, 1976 and 1977. Adjustment is made in each year to change amounts from salary to dividends. Amounts paid by Royal Crown Bottling Company of Winchester, Inc., have been determined to be in part dividends and not salary as reported in the returns. Since dividends are not earned income for the purpose of computation of maximum tax in earned income, the tax has been recomputed accordingly. The maximum tax compensation is applicable for years 1975 and 1977. For the year 1976 the income averaging method of computation is applicable.
c) Dividend Exclusive Increased - 1977 ($91.00) The dividend exclusion has been increased to the maximum amount allowable due to increase in dividend income in (b) above. Claimed
$9.00 Allowed
100.00 Adjustment
(91.00)
OPINION Section 162(a)(1) provides for the deduction of all ordinary and necessary expenses paid or incurred in the carrying on of a trade or business, "including a reasonable allowance for salaries *198 or other compensation for personal services actually rendered." Whether the compensation is "reasonable" compensation is a question of fact. Nowland v. Commissioner,244 F.2d 450, 455 (4th Cir. 1957), affg. a Memorandum Opinion of this Court; Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1154-1155 (1980). As we pointed out in the Home Interiors & Gifts, Inc. case, supra, in determining the reasonableness of the compensation some of the relevant factors to be considered are the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to shareholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer to all employees; and, in the case of small corporations with a limited number of officers, the amount of compensation paid to the particular employee in previous years. However, no single factor is determinative; instead, the factual circumstances in the particular case must be considered *199 as a whole. Home Interiors & Gifts, Inc. v. Commissioner,supra at 1155-1156, which cited and quoted from MaysonMfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court. Moreover, where officer-shareholders who are in control of a corporation set their own compensation, careful scrutiny is required since the purported compensation may be a disguised dividend. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 152 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; Home Interiors & Gifts, Inc. v. Commissioner,supra at 1156. See also, section 1.162-7(b)(1) and section 1.162-8, Income Tax Regs.
In the present case, it is clear that Mr. Bridgeforth rendered valuable services to the corporation. He worked hard and managed the corporation's business in an outstanding manner. [2] *200 *201 The dispute between the parties, the corporation and Mr. Bridgeforth, on one hand, and the respondent, is whether the total yearly compensation paid to Mr. Bridgeforth in each of the years in issue, $182,579.48, $372,403.33 and $281,549.30, respectively, was reasonable compensation or whether a part of such payment should be considered as dividends. Petitioners assert that the compensation arrangement adopted on February 10, 1972, under which the corporation employed Mr. Bridgeforth represented a free bargain entered into by parties operating at arm's length. Petitioners argue that this contingent compensation arrangement was reasonable at the time it was entered into, so that the fact that larger amounts than might ordinarily have been paid were paid out under such arrangement in later years should not make the compensation nondeductible. Petitioners, in making this argument, rely heavily on sections 1.162-7(b)(2) and 1.162-7(b)(3), Income Tax Regs., [3] *202 *203 *204 and on the decision in Kennedy v. Commissioner,671 F.2d 167 (6th Cir. 1982), revg. 72 T.C. 793 (1979). Respondent, on the other hand, disputes that the compensation arrangement was an agreement entered into by independent parties acting at arm's length. Respondent points out that at the time the arrangement was adopted Mr. Bridgeforth owned 250 of the corporation's shares and his father owned the other 300 outstanding shares. Respondent further argues that, even assuming that the arrangement was reasonable at the time adopted, to continue it in light of the changed circumstances in later years was unreasonable. See Pepsi-Cola Bottling Co. of Salinas, Inc., v. Commissioner,61 T.C. 564, 568-569 (1974), affd. 528 F.2d 176 (10th Cir. 1975). Respondent argues that to the extent the decision of the Sixth Circuit in Kennedy v. Commissioner,supra, may be read as being to the contrary, it is incorrect and should not be followed by this Court. In our view, the record in this case clearly shows that the agreement entered into between Royal Crown *205 of Winchester and Mr. Bridgeforth was not reasonable or at arm's length when it was made. As will be discussed hereinafter, the percentages of profits provided for was in excess of the percentages provided by any other bottling company with respect to which evidence was offered, and several witnesses experienced in the industry did not know of any bottling company that provided for such a high percentage for any officer. Also, the relationship between the two stockholders was son and father, and the clear inference from the record is that the father, who was in poor health, was in the process of turning the business over to his son. At the trial, both petitioners and respondent offered the testimony of expert witnesses in support of their respective positions. As will be discussed, there were shortcomings or inadequacies in the opinion given by each of these experts. One of the witnesses for petitioners was a certified public accountant who was a partner in the accounting firm which prepared the corporation's tax returns. This witness, based on his claimed knowledge of the compensation paid by other businesses in the Winchester area to their chief executive officers, gave an *206 opinion that the compensation paid to Mr. Bridgeforth was reasonable. These other businesses all were apparently clients of the witness's accounting firm since, when he was asked on cross-examination to name these businesses and to give specifics as to the type of businesses conducted, the size and extent of the businesses, and to the amounts of compensation paid to management personnel, he refused to answer on the grounds of confidentiality. This witness still refused to answer even after he was told that his failure to answer would result in the Court's giving little weight to his testimony. Accordingly, since no adequate basis or foundation was established for this witness's opinion, we give no weight to his mere conclusionary statement that the compensation paid by the corporation to Mr. Bridgeforth under the circumstances was reasonable. The other three witnesses for petitioners were individuals with extensive experience in the soft drink business. Two of these three individuals at one time or another have actively participated in the operation and management of bottling businesses. However, none of these witnesses, although each gave an opinion that the compensation paid *207 to Mr. Bridgeforth was reasonable, adequately compared such compensation to that paid to the chief executive officers in businesses similarly situated or comparable to that of Royal Crown of Winchester. Instead, each relied heavily on the fact that the bonus arrangement was the sole form of incentive compensation provided to Mr. Bridgeforth since the corporation had not adopted any qualified pension or profit sharing plan or qualified stock option plan. One of these witnesses did briefly review the compensation paid to the management personnel in two other selected bottling operations with which he was familiar. However, in our opinion, none of such operations had a business reasonably comparable to that of Royal Crown of Winchester. For instance, one of the operations the witness had picked was a Pepsi Cola bottling operation which had annual sales of approximately $50 million, a sales volume close to ten times that of Royal Crown of Winchester. None of the other bottling companies with respect to which any of these witnesses had information paid its chief executive a salary approaching that paid to Mr. Bridgeforth, although some of them which far exceeded Royal Crown of Winchester *208 in size paid total executive compensation to several individuals which approached the amount paid to Mr. Bridgeforth and his father. Further, considerably undercutting the testimony of these witnesses was the acknowledgment of one of them on examination that he had never, in his experience in the soft drink business, seen another percentage compensation arrangement in which the employee would receive such a high percentage of the business's profits or net income as 33-1/3 percent. This witness further testified that the only other percentage compensation arrangement he knew of, where such a high percentage of profits was approached, involved an individual who had accepted employment as the chief executive officer of a corporation which had experienced losses during its entire existence. That individual, the witness related, was specifically retained to turn around the business of this corporation and was to receive compensation consisting of a $50,000 salary and 25 percent of gross profits. This testimony of petitioners' own expert refutes the contention that the 1972 compensation agreement was reasonable when adopted. Although a closely held corporation is entitled to deduct reasonable *209 compensation for services actually rendered by a shareholder-employee, the payment of abnormally high compensation does warrant special scrutiny. Cf. HomeInteriors & Gifts, Inc. v. Commissioner,supra at 1161-1162. The testimony of petitioners' own expert leads us to conclude that the 1972 arrangement was not a reasonable one at the time it was adopted. Respondent's expert witness is a principal member of a firm which renders management consulting services. Although neither the witness nor his firm had any particular experience or expertise in the soft drink industry, part of the services offered by the firm is to determine the amount of compensation which a company might offer to an executive whom it is seeking to hire. This witness in his report elaborated on the basis on which the agent who examined Royal Crown of Winchester's returns had arrived at the amounts of compensation allowed in the notices of deficiency. The agent, this witness stated, took the $50,000 per year allowed as deductible compensation in the Pepsi-Cola Bottling Co. of Salinas, Inc. case, supra, as a starting point. This $50,000 amount was then apparently up-dated to the years in issue in the instant *210 case by making adjustments for inflation based on the increased cost of living. This witness was of the opinion that the amounts arrived at were reasonable because such amounts in fact exceeded the amounts of the average compensation paid to executives indicated by several statistical surveys of executive level compensation, among which were the 1968 Financial Survey of the Soft Drink Industry and the 1978 Soft Drink Industry Statistical Profile. In our view it is inappropriate to rely on the conclusion reached on the record presented in a different, earlier case. Petitioners were not parties to the prior case, and there may have been significant differences between the business involved in that case and the business of Royal Crown of Winchester, aside from merely the number of employees and the differences in business conditions prevailing then as compared to the years here in issue. While statistical surveys reporting the average compensation paid in an industry are useful for comparison purposes in examining the reasonableness of compensation, such figures represent only averages and are not determinative. Further, as acknowledged by respondent's witness, the surveys dealt *211 only with cash compensation paid to executives and did not cover deferred compensation such as profit or pension plan contributions or stock options. Obviously, as pointed out by petitioners, such amounts of non-cash compensation furnished to at least some of these executives could well be substantial. Although the only compensation paid Mr. Bridgeforth was cash compensation, it is the total compensation which would be paid to an executive performing the same services in a similarly situated business which must be determined. Section 1.162-7(b)(3), Income Tax Regs. However, these statistical surveys do indicate that the compensation paid to Mr. Bridgeforth was excessive. We conclude that none of the opinions given by these experts can be accepted in its totality. For the reasons stated above, each expert's opinion must be discounted to some extent. One contention made by petitioners is that the arrangement was reasonable because of the number of years it had been in effect, since in many of the years Mr. Bridgeforth's compensation was only nominal in amount. In this connection, petitioners assert that the 1972 arrangement was essentially the same arrangement adopted by the corporation *212 in 1965 and before that had been used by Mr. Bridgeforth's father in employing his son in his sole proprietorship business. In our view, however, the 1972 arrangement was markedly different from the prior two arrangements since a substantial yearly salary of $39,000, in addition to any yearend bonus, was to be paid to Mr. Bridgeforth, regardless of the profitability of the corporation. The two other arrangements, in contrast, did not provide him with a substantial base salary which he would be assured of receiving in any event. Further, the 1972 arrangement substantially increased the percentage rate at which the bonus would be calculated with respect to profits in excess of $30,000. Whereas under the previous two arrangements Mr. Bridgeforth would receive 25 percent of profits, the 1972 arrangement gave him 33-1/3 percent of profits in excess of $30,000. Another contention made by petitioner is that Mr. Bridgeforth in his employment assumed many duties not normally undertaken by a chief executive officer. For instance, Mr. Bridgeforth essentially acted as the production manager at the bottling plant. Additionally, although the corporation employed another individual as a sales *213 manager, it was Mr. Bridgeforth who personally checked in the company's routemen at the end of each business day. Petitioners seem to contend that since Mr. Bridgeforth was performing duties which normally would be undertaken by several employees, his compensation should equal or even exceed the total compensation the corporation would have to pay to hire the several employees who would render the services which he did. Certainly, as we stated earlier, Mr. Bridgeforth worked hard and managed the corporation's business in an outstanding fashion. However, his failure to delegate the performance of certain duties to subordinates may largely have been a matter of personal choice or the method which he decided to use in managing the business. There were other supervisory personnel employed by Royal Crown of Winchester who assisted Mr. Bridgeforth. However, in our view, in determining reasonable compensation for Mr. Bridgeforth, the fact that he managed the business in an outstanding manner should be considered. The expert witnesses offered by petitioners generally testified that it is fairly typical in the soft drink industry for high-level management employees to receive at least part *214 of their compensation as incentive compensation based on the company's profits. Respondent's expert acknowledged that such an arrangement would not be uncommon. For this reason, we conclude that reasonable compensation for Mr. Bridgeforth is properly to be determined by a bonus based on a percentage of net income which would be arrived at in an arm's length agreement between unrelated parties. There is considerable testimony in the record with respect to percentages of profits paid as incentive compensation by other bottling companies to executive officers. We have considered this testimony together with all the other evidence introduced. Based on the record as a whole, we find that reasonable compensation to Mr. Bridgeforth in the corporation's 1975, 1976 and 1977 fiscal years would have been in the amounts of $103,275.77, $188,778.99 and $147,880.94, respectively. We have arrived at such amounts based on Mr. Bridgeforth's receiving compensation consisting of a $39,000 annual salary and a yearend bonus equal to specified percentages of the corporation's income before taxes and the payment of any bonuses. The bonuses allowed were computed on the basis that Mr. Bridgeforth should *215 receive as a bonus an amount equal to 10 percent of the corporation's first $50,000 of income and 15 percent of any income in excess of $50,000. From the lengthy record which contains conflicting opinions of experts as well as statistical data, we have concluded that even though the allowance of 15 percent of all income in excess of $50,000 rather than providing for a maximum to which the 15 percent is to apply is somewhat high, it is reasonable in light of Mr. Bridgeforth's high level of performance. We further find that any amounts paid in the years in issue in excess of the amounts determined above represented the distribution of dividends to Mr. Bridgeforth under section 301. There were clearly sufficient current, as well as accumulated, earnings and profits to cover such distributions since the corporation did show a profit in almost all of the years of its existence and had never declared a dividend. The full amount of the distributions in excess of a reasonable salary for Mr. Bridgeforth would therefore be dividend income to Mr. Bridgeforth. Section 301(c)(1) and 316. Accordingly, such dividend income would not be earned income eligible for the maximum tax under the provisions *216 of section 1348. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
1. - The drivers were the truck drivers of tractor trailers or tankers, who were compensated on an hourly basis. Routemen, on the other hand, acted as sales representatives of the corporation in dealing with various retailers and were paid on commission. Apparently, there were 16 routemen at least beginning in 1974. ↩
2. - The supervisors would include an assistant plant manager who essentially acted as a plant foreman, two route sales supervisors who supervised 8 routemen each, and a sales manager who in turn supervised the two route sales supervisors and worked directly with Mr. Bridgeforth on route and retail sales within franchise areas. 3. - Secretaries, receptionists and bookkeepers. ↩
4. - The only two individuals employed by the corporation in the management category were Mr. Bridgeforth and Mr. Bridgeforth, Sr.↩
a. Based on 25 percent of the net income from the sole proprietorship prior to the payment of bonuses and taxes. ↩
b. Discretionary payments.↩
a. Based on 25 percent of the net income from the sole proprietorship prior to the payment of bonuses and taxes. ↩
c. Based on 25 percent of the corporation's net income prior to the payment of Mr. Bridgeforth, Sr.'s salary; rent on the plant leased from Mr. Bridgeforth, Sr.; bonuses and taxes.↩
b. Discretionary payments. ↩
d. Based on 10 percent of the corporation's first $15,000 of net income, 25 percent of its next $15,000 of net income and 33-1/3 percent of its net income over $30,000, with such income to be determined prior to the payment of yearend bonuses and taxes.↩
*. The corporation was incorporated on January 5, 1965, so its first fiscal year covered about a 5-month period.
2. Respondent's expert witness, although initially of the opinion that Mr. Bridgeforth's performance was only average at best, later agreed that his performance was "above average." The change in this witness's opinion stemmed from his unfamiliarity with the soft drink business and particularly from his failure to initially appreciate that a bottling operation not possessing a Coca Cola or Pepsi Cola franchise operates at a distinct competitive disadvantage. At the trial petitioners offered the testimony of Mr. Bridgeforth and several other witnesses with extensive experience in the soft drink industry. These witnesses testified that Coca Cola and Pepsi Cola franchises are the premier franchises to have in the business, whereas, in comparison, a Royal Crown franchise is not as desirable. The testimony shows that Royal Crown does not conduct as strong an advertising campaign as Coca Cola or Pepsi Cola, that it does not have the percentage of the soft drink market that its two larger competitors have and, in fact, that it has experienced a decline in its share of the soft drink market. The corporation's profitability over the years, despite its lack of a Coca Cola or Pepsi Cola franchise and other evidence of record, clearly establishes that Royal Crown of Winchester's business was well managed.
3. Sec. 1-162-7, Income Tax Regs., states in relevant part as follows: Sec. 1.162-7. Compensation for personal services. (a) There may be including among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.
(b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows: (1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. An ostensible salary may be in part payment for property. This may occur, for example, where a partnership sells out a corporation, the former partners agreeing to continue in the service of the corporation. In such a case it may be found that the salaries of the former partners are not merely for services, but in part constitute payment for the transfer of their business. (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.